Argued and submitted August 18, ballot measure explanatory statement certified as modified August 27, reconsideration denied September 8, 1998

## Bill SIZEMORE,
*Petitioner,*

*v.*

## Hardy MYERS,
Attorney General,
State of Oregon,
Roger Gray, Greg Hartman, Steve Harper,
and Kathleen Beaufait,
*Respondents,*

*and*

## Daniel W. MEEK,
*Intervenor.*

(SC S45582)

964 P2d 255

Gregory W. Byrne, of Byrne & Associates, P.C., Portland, filed the petition and argued the cause for petitioner.

Gregory A. Hartman, of Bennett, Hartman, and Reynolds, Portland, argued the cause for respondents Gray, Hartman, and Beaufait. With him on the answering memorandum was Aruna A. Masih, Portland.

Michael D. Reynolds, Solicitor General, Salem, waived appearance for respondent Myers.

No appearance for respondent Harper.

Daniel W. Meek, Portland, filed the memorandum and argued the cause for intervenor *pro se*.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Durham, Kulongoski, and Leeson, Justices.

CARSON, C. J.

Durham, J., dissented and filed an opinion.

## CARSON, C. J.

This is an original proceeding in which petitioner challenges the explanatory statement for Ballot Measure 59 (1998). If adopted, Measure 59 would amend the Oregon Constitution to prohibit public funds from being spent to collect or assist in the collection of "political funds." The measure defines "political funds" as funds contributed to a candidate or political action committee, or funds spent to support or oppose a candidate for public office or a ballot measure.

■ An explanatory statement committee, composed of five citizens including petitioner, prepared an explanatory statement for Measure 59 and filed that statement with the Secretary of State. ORS 251.205; ORS 251.215(1). Petitioner dissented from that statement. The Secretary of State held a hearing to receive comments on the prepared explanatory statement, and petitioner offered suggestions at that hearing. ORS 251.215(2). Consequently, petitioner is entitled to seek a different explanatory statement in this court. ORS 251.235; *see also Homuth v. Keisling (S39531)*, 314 Or 214, 218, 837 P2d 532 (1992) (ORS 251.235 allows Supreme Court review of only those explanatory statements for which suggestions were offered by any person at the Secretary of State's hearing).

■ Our task is to determine whether the explanatory statement contains a sufficient and clear statement explaining the measure. *See June v. Roberts*, 310 Or 244, 247, 797 P2d 357 (1990) (court reviews explanatory statement to determine whether it is "insufficient or unclear"); ORS 251.235 (a petition to review an explanatory statement must state the reasons why the statement is "insufficient or unclear"). As we shall explain, we conclude that two of petitioner's challenges to the explanatory statement are well taken, and, accordingly, we modify the explanatory statement and certify the modified statement to the Secretary of State. *See* ORS 251.235 (describing review process).

The explanatory statement for Measure 59 provides as follows:

"This measure adds a new section to the Oregon Constitution that prohibits any person or organization from using

public resources to collect or help collect political funds. Public resources that cannot be used to collect political funds include public moneys, public employee time, public property and public equipment and supplies. Political funds include any money contributed to candidates or political committees and any money spent supporting or opposing a candidate, ballot measure or initiative petition. A public body is prohibited from using its resources to collect political funds even if it is reimbursed for the cost.

"An organization violating this measure by using non-political funds (collected for it by a public body) for a political purpose will lose the right to payroll deductions by any public body for all purposes.

**"This measure prohibits several activities currently allowed under Oregon law. For example, under this measure it would be illegal:**

"1) To use public property, including public buildings, to collect or help collect political campaign funds.

"2) To recognize a public employee's request to payroll deduct part of the employee's wages and transfer that deducted money to an organization that uses all or part of that money to support or oppose candidates, initiatives or ballot measures.

"3) To include in the voters' pamphlet any paid statement supporting or opposing candidates, initiatives or ballot measures."

(Boldface in original.)

Petitioner raises four challenges to the explanatory statement. First, he objects to the use of the word "illegal" in the third paragraph, contending that it is a "charged" term that will inflame the voters. Second, he objects to the use of boldface type in the third paragraph, contending that it inappropriately highlights the purported effects if Measure 59 is adopted, drawing attention away from the description of the measure contained in the first two paragraphs. Third, petitioner objects to the final paragraph of the explanatory statement, because he disagrees that the measure, if adopted, will affect the voters' pamphlet. Finally, he challenges the notion that an explanatory statement, such as the one prepared

here, may include any description of the purported effects of the measure.

Respondents Gray, Hartman, and Beaufait (respondents)[1] and intervenor contend that the explanatory statement properly and accurately describes the effects if Measure 59 is adopted by the voters. Intervenor also offers some minor grammatical modifications to the statement, concerning the discussion of the voters' pamphlet.

■■ We first consider whether ORS 251.215(1) permits the explanatory statement committee to include a description of the effects of a measure in the explanatory statement. Because the answer is a matter of statutory construction, we follow the template set out in *PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). We first examine the text and context of the statute. *Id.* at 610-11. Context includes other related statutes and earlier versions of the statute under consideration. *See Owens v. Maass*, 323 Or 430, 435, 918 P2d 808 (1996) (so stating). If the meaning of the statute cannot be determined from an examination of its text and context, then we examine the legislative history of the statute. *PGE*, 317 Or at 611-12. Our goal at both levels of analysis is to determine legislative intent. *Id.* at 610-12.

■ ORS 251.215(1) requires an explanatory statement committee to prepare "an impartial, simple and understandable statement *explaining the measure*," not to exceed 500 words. (Emphasis added.) As a textual matter, the parties' dispute centers upon the meaning of the word "explaining." The statute does not define that term, so we turn to its plain, natural, and ordinary meaning. *See PGE*, 317 Or at 611 (words of common usage typically should be given their plain, natural, and ordinary meaning).

The dictionary definition of the word "explain" provides, in part:

---

[1] Respondent Myers waived appearance on review; respondent Harper did not appear on review.

"**ex·plain** * * * **1 a :** to make manifest : present in detail : EXPOUND, DISCLOSE * * * **b :** to make plain or understandable : clear of complexities or obscurity : INTERPRET, CLARIFY * * * **c :** to give the meaning or significance of : provide an understanding of * * * **d :** to give the reason for or cause of * * * **3 a :** to show the logical development of : EXPLICATE."

*Webster's Third New Int'l Dictionary*, 801 (unabridged ed 1993) (boldface in original). Respondents emphasize that one meaning of the word "explain" is "to show the logical development of." In their view, that broader definition demonstrates that, in directing the explanatory statement committee to "explain[ ]" a measure, ORS 251.215(1) permits the committee to show the logical developments, *i.e.*, the effects, of the measure in the explanatory statement. Stated differently, respondents contend that the words "explaining the measure," as used in ORS 251.215(1), encompass explaining the effect or effects of the measure.

That is one logical interpretation of the text of ORS 251.215(1). However, the wording of that statute also suggests that the purpose of an explanatory statement is to describe the measure *itself*, in a manner that is sufficient and clear. That is, an explanatory statement must "make plain or understandable," or "provide an understanding of," the *measure*, but not its *effect*. In that vein, it is significant that ORS 251.215(1) does not provide that an explanatory statement also must, or may, identify the *effect* of a measure. *Compare* ORS 250.035(2)(d) (summary of ballot title for state measure must summarize measure "and its major effect").

Turning to the context of ORS 251.215(1), we observe that an earlier version of that statute required the explanatory statement committee to prepare "an impartial, simple and understandable statement explaining the measure *and its effect*." ORS 251.215(1) (1991) (emphasis added). *See also Homuth*, 314 Or at 220 (stating, in relation to the 1991 version of the statute, that the court must determine whether a challenged explanatory statement is "a sufficient and clear statement of the measure and its effect" (internal quotation marks omitted)). However, the 1993 Legislature

removed the phrase "and its effect" from ORS 251.215(1). Or Laws 1993, ch 493, § 20; Or Laws 1993, ch 811, § 14.

We can draw one of two conclusions from the legislature's decision to remove the phrase "and its effect" from ORS 251.215(1). On one hand, that statutory change suggests that the legislature intended to *prevent* explanatory statements from explaining the effect or effects of a measure, thereby limiting an explanatory statement to explaining the measure itself. That is petitioner's position here. However, the 1993 change also could have been intended to remove the *requirement* that an explanatory statement explain the effect of a measure, while still *permitting* the statement to explain such an effect, if the committee chooses to do so. That reading of the statute is consistent with respondents' proffered definition of the word "explain," because it incorporates the notion that, in order to "explain" a measure, a committee may "show the logical development of" the measure, *i.e.*, set out its effect or effects.

Because the legislature's intent is not clear from an examination of the text and context of ORS 251.215(1), we turn to the available legislative history. The 1993 amendment to ORS 251.215(1), which removed the phrase "and its effect," was made through two different bills, one introduced in the House and one introduced in the Senate. In the House, the 1993 amendment was part of House Bill (HB) 2275, which was an omnibus elections bill drafted by the Secretary of State and the Oregon Association of County Clerks. From the outset, that bill contained a provision that deleted the phrase "and its effect" from ORS 251.215(1). In the Senate, the 1993 amendment was part of Senate Bill (SB) 1072, which made several changes to the voters' pamphlet statutes and also was drafted by the Secretary of State. Although SB 1072 originally did not contain a provision deleting the phrase "and its effect," a Senate committee amended that bill to include such a provision, at the request of the Secretary of State. Minutes, Senate Committee on Ethics, Elections, and Campaign Finance, SB 1072, May 18, 1993, p 7. The 1993 Legislature passed both HB 2275 and SB 1072 with those identical provisions intact, and the governor signed them into law. Or Laws 1993, ch 493, § 20; Or Laws 1993, ch 811, § 14.

Testimony supporting both bills is helpful, to some extent, to our inquiry here. For example, written testimony presented by the Secretary of State's Office in support of HB 2275 stated that the "requirement" that an explanatory statement explain the effect of a measure should be deleted from ORS 251.215(1) "because of ambiguity of the term and its meaning, and the difficulty in addressing this term in drafting the explanatory statements." Testimony, House Committee on General Government, Subcommittee on Government, HB 2275, January 26, 1993, Exhibit D, p 2 (statement of Phil Keisling, Secretary of State). That testimony suggests the following sources of concern surrounding the "effect" requirement of ORS 251.215(1). First, it was difficult to determine exactly what was meant by the "effect" of a measure. Second, the explanatory statement committees had difficulty determining the particular "effects" of the measures at issue. Further, both those difficulties apparently stemmed from the fact that the statute *required* the committees to agree upon the effects of the measures at issue.

Additional testimony also demonstrates that the purpose of the amendment to ORS 251.215(1) was to avoid inevitable disputes on explanatory statement committees, which are composed of two opponents of the measure, two proponents, and one neutral person, ORS 251.205(2) to (4), concerning the true effect or effects of the measure. For example, Nina Johnson of the Secretary of State's Office testified as follows before a House subcommittee concerning HB 2275:

> "The discussions and disputes over what the word 'effect' of the measure means are significant in the committee proceedings. * * * [T]here's not a common-sense understanding of this, and, quite frankly, I would bet that probably 99 percent of the time, * * * the fifth voting member of the committee has to make that call, because there's not agreement over what that means."

Tape Recording, House Committee on General Government, Subcommittee on Government, HB 2275, January 26, 1993, Tape 3, Side B (statement of Nina Johnson). Johnson added that, as an alternative to deleting the requirement entirely, the Secretary of State's Office could work to define the word "effect," as it was used in ORS 251.215(1). *Ibid.*

At a subsequent hearing on HB 2275, at the request of subcommittee members, Todd Jones of the Secretary of State's Office gave a more detailed explanation of the problems in drafting the "effect" part of an explanatory statement:

"This language is borne [*sic*] out of the experience of the nine explanatory statement committees from the 1992 general election. * * * More than half of our explanatory statement committees during the 1992 general [election] elected *not* to try to comment on [a measure's] effect in their statement. Their reasoning * * * was that, by definition, we're opponents and proponents of this measure, and * * * the whole purpose of arguing this measure is to try to figure out what its effect will and will not be. We are *never* going to agree on its effect at this table, [and] the best we can do is to simply try to come to some understanding of what this language means—* * * the simple, impartial explanation of the measure. And what they decided in * * * more than half of those nine [committees] is that [they would] leave it to arguments that could be submitted to the voters' pamphlet to argue the effects of the measure."

Tape Recording, House Committee on General Government, Subcommittee on Government, HB 2275, February 9, 1993, Tape 11, Side B (statement of Todd Jones). Jones added that, for the committees that did try to include an explanation of the effects of the measures, "the language they were able to agree on was at best amorphous" and difficult for a lay person to understand. *Ibid.*

Jones also testified before a Senate committee, advocating that the committee amend SB 1072 to eliminate the phrase "and its effect" from ORS 251.215(1). There, Jones reiterated his earlier testimony that explanatory statement committees often are fraught with division, with the opponent and proponent members each trying to "win over" the fifth, neutral committee member. Tape Recording, Senate Committee on Ethics, Elections, and Campaign Finance, SB 1072, May 18, 1993, Tape 67, Side A (statement of Todd Jones). Jones concluded:

"[W]e're scratching the words 'and its effect' because obviously that's where supporters and opponents differ.

> That's where they diverge and break is in their interpretation of * * * what will the effect of [the] measure be, and so clearly a lot of the committees chose to not mess with the effect and to just focus on the explanation."

*Ibid.* Immediately following Jones's testimony, one legislator recalled similar problems on a particular explanatory statement committee, which he characterized as involving a "gruesome" discussion. The members of the Senate committee then unanimously voted to remove the phrase "and its effect" from ORS 251.215(1). *Ibid.*

As can be seen, the legislative history demonstrates that the earlier requirement that an explanatory statement committee explain the effect of a measure was problematic, because often there was disagreement about what was encompassed by the word "effect," and because deciding the particular "effect" of a measure often caused division among the committee members. Indeed, despite that statutory requirement, many committees apparently did not include explanations of the effect of the measures before them. Nonetheless, the legislative history does not reflect an antipathy toward the notion that an explanatory statement *contain* an explanation of the effect of a measure. Rather, the history demonstrates that the *requirement* that the explanatory statement committees explain such effects left divided committees with a choice of two evils—either have an acrimonious debate concerning the potential effect of a measure or disobey the law and omit the effect from the explanatory statement altogether.

■ ■ Our review of the legislative history of ORS 251.215(1) leads us to conclude that the legislature intended to eliminate the *requirement* that an explanatory statement committee explain the effect or effects of a measure, but that the legislature did not intend to *prevent* a committee from explaining effects altogether. Our conclusion is consistent with the purpose of an explanatory statement, which serves to inform the electorate, in a more detailed manner than the ballot title, about the nature of the measure being proposed. The purpose of any ballot measure is to effect a certain change in the law, either by changing the law as it currently exists or by adding a new provision or provisions. In either

circumstance, an explanation of the effect of a measure can be a critical part of an explanation of the measure itself, because the voters will be able to make a more informed decision after understanding the effect if the measure is approved by the voters.

In sum, we conclude that, in directing an explanatory statement committee to prepare a statement "explaining" the measure in ORS 251.215(1), the legislature intended only to remove a statutory requirement that, if obeyed, could lead to prolonged and fruitless committee debate and that, if disobeyed, could lead to a challenge that the resulting explanatory statement, *without* a statement of "effect," was insufficient as a matter of law. The statutory wording that the legislature chose to retain still permits an explanatory statement committee to explain the effect or effects of a measure, when the committee finds that to do so will further its statutory duty to "explain[ ]" the measure.

 The next question to be addressed concerns the standard of review to be applied to those effects that the explanatory statement committee has seen fit to include in the explanatory statement. We find no indication, either from the text and context of ORS 251.215(1), or the legislative history of the 1993 change to its wording, that the legislature intended that this court depart from its longstanding approach to judicial review of explanatory statements under ORS 251.235.

That approach has been one of deference. We long have held that this court "should not invalidate [an explanatory statement] or modify it unless its insufficiency is beyond reasonable argument." *June*, 310 Or at 248 (quoting *Teledyne Wah Chang Albany v. Powell*, 301 Or 590, 593, 724 P2d 319 (1986)). As this court has explained, under the earlier version of ORS 251.215(1):

> "[W]e do not believe that ORS 251.235 meant to call on this court to settle disputes over the meaning of a measure in reviewing and certifying explanatory statements, especially since Voters' Pamphlet statements in turn become 'legislative' history when that meaning later is disputed by persons affected by the measure in a concrete case. At this stage, the court's scrutiny goes only so far as necessary to

determine, not whether a more detailed or comprehensive explanatory statement might have been written, but whether the committee's statement falls short to the point of being 'insufficient.' "

*MacAfee v. Paulus*, 289 Or 651, 655, 616 P2d 493 (1980). The court then described in some detail two diametrically opposing interpretations of the measure at issue in that case, one of which had been adopted and the other rejected by the committee preparing the explanatory statement. The court declined to resolve the controversy, stating in effect that the committee's choice was not itself legally insufficient under the governing statute, even though another, opposing choice also would have been defensible. *Id.* at 657.

We adhere to the foregoing rule of deference in assessing the challenges to the statements of effect adopted by the explanatory statement committee in this case. It is not our function to resolve disputes, whether among committee members or with other members of the public, concerning whether a better or different statement of a result or results could have been included in the explanatory statement. Rather, petitioner has the burden under ORS 251.235 of showing that the choices that the committee did make were legally "insufficient."

■ The explanatory statement in this case identifies three purported effects if Measure 59 is adopted. The first listed effect is the prohibition of the use of "public property, including public buildings, to collect or help collect political campaign funds." For the most part, that wording is taken directly from the text of the measure itself. The committee did not create an insufficient explanatory statement by including it.

The second and third effects of Measure 59 listed in the explanatory statement, concerning certain payroll deductions made in behalf of public employees and paid statements in the voters' pamphlet, are not delineated in the wording of the measure itself. However, petitioner has not demonstrated that either purported effect is one that cannot be justified by the wording of the measure. Neither, therefore, is clearly wrong, and the explanatory statement is not rendered insufficient by including both.

We stress that, because of our deferential standard of review, approval by this court of a particular explanatory statement does not place any kind of judicial imprimatur upon that statement. The legal correctness of propositions set out in the explanatory statement often will have to be determined in the context of a case that raises issues concerning the meaning of the measure, brought after the measure has been approved by the voters.

We turn to petitioner's remaining challenges, which concern the third paragraph of the explanatory statement. First, petitioner objects to the use of the word "illegal" in that paragraph, contending that the word is unnecessarily "charged." At oral argument, respondents conceded that the word "illegal" was inappropriate and agreed that that word, together with the clause accompanying it, could be deleted from the third paragraph of the explanatory statement. We shall modify the explanatory statement in accordance with that suggested change.

Petitioner also objects to the use of boldface type in the third paragraph of the explanatory statement. We agree with petitioner that the use of boldface type here could be misleading to the voters, because it highlights the stated effects of the measure, rather than the earlier description of the text of the measure. *See Homuth*, 314 Or at 220 (a "potentially misleading" statement is insufficient). Consequently, we shall modify that third paragraph to remove the boldface type.

Finally, intervenor requests that we modify the final paragraph of the explanatory statement, to capitalize the words "voters' pamphlet" and to state the effect upon the voters' pamphlet consistently in either a plural or singular voice. Although intervenor offers suggestions that perhaps would result in a "better" explanatory statement, he does not demonstrate that the statement as written is "insufficient or unclear." *See Teledyne*, 301 Or at 593 (court's task is not to write a "better" statement). We therefore reject those proposed modifications.

Consistent with the foregoing discussion, we modify the explanatory statement for Measure 59 and certify the following explanatory statement to the Secretary of State:

This measure adds a new section to the Oregon Constitution that prohibits any person or organization from using public resources to collect or help collect political funds. Public resources that cannot be used to collect political funds include public moneys, public employee time, public property and public equipment and supplies. Political funds include any money contributed to candidates or political committees and any money spent supporting or opposing a candidate, ballot measure or initiative petition. A public body is prohibited from using its resources to collect political funds even if it is reimbursed for the cost.

An organization violating this measure by using non-political funds (collected for it by a public body) for a political purpose will lose the right to payroll deductions by any public body for all purposes.

This measure prohibits several activities currently allowed under Oregon law. For example:

1) To use public property, including public buildings, to collect or help collect political campaign funds.

2) To recognize a public employee's request to payroll deduct part of the employee's wages and transfer that deducted money to an organization that uses all or part of that money to support or oppose candidates, initiatives or ballot measures.

3) To include in the voters' pamphlet any paid statement supporting or opposing candidates, initiatives or ballot measures.

Ballot measure explanatory statement certified as modified. Pursuant to ORAP 1.20(4) and notwithstanding ORAP 11.30(10), this opinion will become effective when the appellate judgment issues. The State Court Administrator shall issue the appellate judgment at 12:00 p.m. on August 31, 1998, unless a petition for reconsideration is both filed with and physically received by the Office of the State Court Administrator by that time. Any timely petition for reconsideration will stay issuance of the appellate judgment until the court acts on such petition.

**DURHAM, J.,** dissenting.

I would dismiss the petition for the reasons expressed in my dissenting opinion in *Deras v. Myers*, 327 Or 472, 479, 962 P2d 692 (1998) (Durham, J., dissenting).

Accordingly, I dissent.