Argued and submitted May 13, accused suspended from practice of law for period of 90 days, commencing 60 days from date of decision July 15, 2010

## In re Complaint as to the Conduct of

## FREDERICK T. SMITH,
*Accused.*

## (OSB 07-53; SC S056148)

236 P3d 137

Frederick T. Smith argued the cause and filed the briefs *in propria persona*.

Mary A. Cooper, Assistant Disciplinary Counsel, argued the cause and filed the brief for the Oregon State Bar.

PER CURIAM

## PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar charged Frederick T. Smith (the accused) with four violations of the Oregon Rules of Professional Conduct (RPC) in connection with his representation of a client, Rochelle Leveque, in 2005. Specifically, the Bar alleged that the accused violated RPC 3.1 (taking action on behalf of a client with no nonfrivolous basis); RPC 4.1(a) (making a false statement of material fact or law to a third person in the course of representing a client); RPC 8.4(a)(2) (committing a criminal act that reflects adversely on a lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects); and RPC 8.4(a)(3) (conduct involving dishonesty, fraud, deceit, or misrepresentation that reflects adversely on the lawyer's fitness to practice law). Following a hearing, a trial panel of the Disciplinary Board concluded that the accused had violated the rules as alleged and suspended the accused for 90 days.

The accused seeks review pursuant to ORS 9.536(1) and Bar Rule of Procedure (BR) 10.1, challenging the findings and conclusions of the trial panel with respect to each alleged violation. We review bar disciplinary matters *de novo*. ORS 9.536(2); BR 10.6. The alleged misconduct must be proved by clear and convincing evidence. BR 5.2. For the reasons that follow, we conclude that the accused violated the four rules listed above. We also conclude that the accused should be suspended for 90 days.

## I. FACTUAL BACKGROUND

The charges against the accused arise out of his advice to Leveque and his conduct in connection with a dispute between Leveque and her employer, The Hemp & Cannabis Foundation (the corporation),[1] which operated a clinic that helped patients register for the Oregon Medical

---

[1] As described in greater detail in the text, around the time of the events at issue in this proceeding, the corporation failed to file required reports with the Secretary of State's office and therefore was "administratively dissolved" under ORS 65.651 for a period of several months. During that time, a third party registered the name "The Hemp and Cannabis Foundation" under Oregon's assumed business name statute and incorporated a different nonprofit corporation using that name. Because the third party had acquired the right to that name, in January 2006 the corporation changed its name to "THCF."

Marijuana Program. In brief, Leveque, who had been asked to leave the clinic premises in early October 2005 due to an issue with another employee—and who had not thereafter returned to work—entered the clinic with several other individuals before business hours on November 14, 2005, and attempted to physically take over management of the clinic. The accused also came to the clinic that morning, in the course of his representation of Leveque, and participated in the events as described below. Eventually, after the corporation's attorney and the police arrived, the accused, Leveque, and the others who had come with Leveque left.

Many of the facts were disputed during the hearing, and the trial panel (and this court) faced the added difficulty that Leveque died before the hearing and did not testify. Nevertheless, the trial panel generally found the facts as alleged by the Bar.[2] Although the accused correctly identifies certain factual errors in the trial panel's opinion, based on our *de novo* review, the findings that we make are consistent with most of the trial panel's findings. We first describe the context of the event that led to the Bar's charges and then, in discussing each alleged violation, we set out additional facts related to that violation. Except as otherwise noted, we find each of the facts stated below by clear and convincing evidence.

The accused met Leveque in 2004 when he became a patient at the clinic while Leveque was employed there. In 2005, Leveque asked the accused for legal advice about difficulties that she was having with her employer and Paul Stanford, who ran the clinic and several similar clinics in other states. The accused agreed to represent Leveque. Although the parties disagree about Stanford's exact position with the corporation in 2005, it is undisputed that he was the sole incorporator of the corporation when it was established in 1999, that an October 2005 printout from the Secretary of State's online business names registry identified him as president, and that, at the time of the events at issue here,

---

[2] The public member of the trial panel agreed with the panel's findings but included an additional statement of his views in the trial panel's opinion. The public member was more skeptical of the accused's veracity than the other members.

employees of the corporation (including Leveque) considered him to be in charge of the corporation's business.

On October 7, 2005, as noted above, the clinic manager asked Leveque to go home. She attempted to file an unemployment claim, although she told the accused that she was uncertain whether she had been fired. Over the next month, Leveque did not return to work at the clinic; however, she was apparently attempting to get back (or retain) her job and still had a key to the clinic.

Meanwhile, the accused contacted Ann Witte, the corporation's attorney, to attempt to resolve Leveque's employment dispute. Leveque also had a number of concerns about the way the corporation was being run by Stanford— including whether revenues were being appropriately accounted for, whether corporate assets were improperly being used to advocate for marijuana legalization, and other corporate governance issues—and the accused advised Leveque in connection with those issues. As part of his legal work for Leveque, the accused researched the corporation's status.

We pause briefly to discuss the law regarding the administrative dissolution of nonprofit corporations, because it relates to the accused's position that he gave sound legal advice and that he relied in good faith on information that he had received from the Secretary of State's office. A nonprofit corporation, like the corporation here, that fails to file an annual report (or to take certain other required actions) may be dissolved by action of the Secretary of State if it does not correct the grounds for dissolution after receiving notice of its deficiencies. *See* ORS 65.647 (describing grounds for administrative dissolution); ORS 65.651 (describing procedure for administrative dissolution). A corporation that is administratively dissolved "continues its corporate existence but may not carry on any activities except those necessary to wind up and liquidate its affairs." ORS 65.651(3). However, within five years of the dissolution, a corporation may apply for "reinstatement," which, if allowed, relates back to the date of the administrative dissolution, "and the corporation resumes carrying on its activities as if the administrative dissolution

had never occurred." ORS 65.654(1), (3). (Moreover, the five-year reinstatement deadline can be waived by the Secretary of State for "good cause." ORS 65.654(4).) Expert testimony at the disciplinary hearing established that it is common for nonprofit corporations to fail to file required reports or notices, to be administratively dissolved, and then to be reinstated. Indeed, the corporation here has been administratively dissolved and reinstated at least three times.

In researching the corporation's status, the accused obtained a certificate dated October 31, 2005, from the Secretary of State, which stated that the corporation had been "administratively dissolved" for more than five years. That certificate, however, was inaccurate. The person who prepared the certificate inserted the original date of incorporation (August 19, 1999) in the certificate as the date of dissolution, rather than the actual date of the most recent administrative dissolution (October 14, 2005), thus incorrectly indicating that the dissolution had occurred more than five years before the date of the certificate. In fact, the Secretary's business names registry, available to the public through the Secretary's website, shows (accurately) that the corporation had been dissolved for less than a month on October 31, 2005, and therefore easily could have been reinstated. As discussed further below, the accused maintains that he did not check the website and did not know, at the time of the events that led to this proceeding, that the certificate that he had obtained from the Secretary of State was inaccurate.

The accused also claims that in November 2005 he believed—because he believed that the corporation had been administratively dissolved for more than five years, and because he had found no records indicating that Stanford was an officer or director of the corporation—that Stanford had no legal authority within the corporation and that he had improperly "operated it as though it was his personal asset." The accused explained to Leveque, however, that she "had no claim against the corporation because she had no standing." He told her, "the only route that you can take here is to go through the attorney general." The accused and Leveque

agreed that the appropriate course for her to raise her concerns about the governance of the corporation would be to file a complaint with the Attorney General.

On November 9, 2005, when Witte had not responded to the accused's attempts to contact her, the accused sent Witte a letter discussing Leveque's employment issue and her complaints about Stanford's running of the corporation. He noted that Leveque's "route to right the wrongs which have occurred on the former leader[']s watch is to file a complaint with the Oregon Attorney General's office." He stated that he was "very familiar with the process" and that, after a complaint is filed, the Attorney General "issues an immediate Cease and Desist Order and enforces that order." The accused informed Witte that if she did not contact him by November 15, he would file a complaint with the Attorney General.

After sending the November 9 letter, the accused met with Leveque. According to the accused, once Leveque saw the threat to go to the Attorney General in writing, she "freaked out." Leveque was concerned that the Attorney General might shut down the clinic and that, as a result, thousands of patients would not be able to get access to medical marijuana. The accused told Leveque that he could not assure her with certainty that the Attorney General would not shut down the clinic if he filed the complaint.

According to the Bar, the accused then advised Leveque that another option would be to go to the clinic, use her key to enter before business hours, and physically take over. The accused claims, however, that Leveque decided on her own that she would use her key to open the office and attempt to take over management of the clinic. He then advised her that she had "equal rights with Mr. Stanford" to run the clinic and that he could defend her from criminal or civil actions that might arise out of an attempted takeover.

On November 14, 2005, as noted, Leveque and some other individuals (including a nurse, a doctor, a computer technician, and a locksmith) arrived at the clinic before it opened and before any employees were there. Leveque used her key to let them in. The locksmith began changing the locks, and others attempted to begin working on the clinic's

computers. The accused also came to the clinic that morning, although he states that he came separately from Leveque. The first employee of the clinic to arrive was Kim Murphy, whose job was to open the clinic for business. Murphy testified that Leveque, her associates, and the accused were inside the clinic when she arrived at about 7:45 a.m. When Murphy asked Leveque what was going on, Leveque told her, "We're taking over the clinic." Other clinic employees who arrived testified that Leveque made similar statements to them. At one point, Leveque began taking patient schedules and placing them in her bag.

At least two clinic employees, office manager Janus Brown and clinic administrator Scott Carr, told Leveque and the accused to leave. They refused. The accused maintains that he believed at that time that the lease was in the corporation's name and that, because he believed that Stanford had no legal authority to run the corporation, neither Stanford nor those working for him had any right to direct them to leave the premises.

At some point, a clinic employee called the police. According to police records, the initial call came at 9:32 a.m., and the first police officers arrived at the scene at 9:37 a.m. A clinic employee also phoned Stanford, who was in Hawaii; Stanford phoned Witte. Witte arrived at the clinic at about the same time as the police.

According to the Bar, the accused told clinic employees and the police that he and Leveque had a court order or some written authorization from the Attorney General to be there. According to the accused, he said only that he had a complaint letter that he had drafted to send to the Attorney General. He claims that he showed the complaint letter to the police and Witte and told them that he was going to go to the Attorney General the following day if Leveque's issues could not be resolved.

The police attempted to resolve the dispute. Sergeant Kim Keist understood that Leveque believed that the clinic was not being properly operated and that there was a disagreement over who had the right to run the clinic. It was her view at the time, which she explained to Leveque and the accused, that this was a civil dispute that have

to be resolved in court and that Leveque—because she had "walked away from [the clinic]"—was not authorized to enter the clinic and take it over. In the meantime, someone had contacted the landlord, who faxed the lease agreement to the clinic. The lease showed the corporation as the lessee and Stanford as the "guarantor." After the accused saw the lease, he advised Leveque and her associates to leave, and they all left the premises. The police left the scene at 10:27 a.m.

## II.  ALLEGED VIOLATIONS

### A.  *RPC 3.1*

The Bar argues that the accused violated RPC 3.1 when he told Leveque that (1) she was legally entitled to take over the clinic and (2) she was legally entitled to enter the clinic's premises when it was closed to the public. Indeed, the Bar suggests that the accused knew in advance that Leveque intended to try to take over the clinic and that he assisted in that effort, also in violation of RPC 3.1. RPC 3.1 provides:

> "In representing a client or the lawyer's own interests, *a lawyer shall not knowingly* bring or defend a proceeding, assert a position therein, delay a trial or *take other action on behalf of a client, unless there is a basis in law and fact for doing so that is not frivolous,* which includes a good faith argument for an extension, modification or reversal of existing law, except that a lawyer for the defendant in a criminal proceeding, or the respondent in a proceeding that could result in incarceration may, nevertheless[,] so defend the proceeding as to require that every element of the case be established."

(Emphases added.)

Although the Bar and the accused focus on whether the accused's legal *advice* to Leveque had a nonfrivolous basis, we note that the Bar did not charge the accused with failing to "provide competent representation to a client," in violation of RPC 1.1. The text of RPC 3.1 refers not to legal advice, but to a lawyer's "action on behalf of a client." The word "action," in this context, appears to mean "a thing done : DEED." *See Webster's Third New Int'l Dictionary* 21 (unabridged ed 2002) (defining "action"). Moreover, the rule uses the phrase "other *action* on behalf of a client," in contrast to

the "actions" mentioned earlier in the rule, *viz.*, "bring[ing] or defend[ing] a proceeding, assert[ing] a position therein[, or] delay[ing] a trial." RPC 3.1 (emphasis added). Giving legal advice to a client is "a thing done," a "deed." So is appearing with a client at premises over which the client believes she has a right to assert control and acting with and on behalf of the client in discussions with other persons on the premises and with police. We conclude that the accused's advice to Leveque and his conduct on November 14, 2005, in the course of representing her were "action[s]" within the scope of RPC 3.1. The pivotal factual issue, then, is whether defendant took the actions alleged by the Bar. If he did, the pivotal legal issue is whether there was a nonfrivolous basis in law or fact for the accused's actions.

As to the factual dispute, the accused argues that he did not advise Leveque that she had the right to take over the clinic or to enter the premises before the clinic was open to the public. Instead, he argues, the actions that Leveque took on November 14, 2005, were on her own initiative; he advised her only that she had as much right as Stanford to run the clinic and that he thought that he could defend her in any resulting civil or criminal proceedings if she chose to attempt to take over the clinic.[3] He claims that, based on his understanding of the facts when he gave the advice (including the legal status of the corporation), his advice was legally sound. He also appears to argue that, even if he had advised Leveque that she had a right to take over the clinic, that advice would have been sound as well. He asserts that the legal doctrines of "choice of evils" and "self-help" support his position.

The Bar's theory that defendant assisted Leveque in planning to take over the clinic is plausible and is supported by some circumstantial evidence. Nevertheless, in the absence of testimony from Leveque, and given the accused's

---

[3] Before the trial panel, the accused offered different versions of events. At one point, he claimed that he did not know that Leveque was going to attempt a takeover; at another, he admitted that he knew and advised against it, but that he could not stop her. In a letter to the Bar during its investigation of the case, the accused wrote, "I then arranged for my client to meet me on November 14 at the clinic to try to catch Mr. Stanford and tell him that we felt constrained to either complain to the Attorney General's Office or take over the clinic with new management."

denials, we do not find by clear and convincing evidence that the accused worked with Leveque in advance to plan the attempted "takeover." That said, clear and convincing evidence does support the Bar's contentions that (1) the accused appeared at the clinic early on the morning of November 14 in the course of his representation of Leveque and asserted to Witte and Officer Keist that Leveque had the same right to operate the clinic as did Stanford and therefore had the right to take over physical control of the clinic, and (2) the accused previously had told Leveque that she could assert the defenses of "choice of evils" and "self-help" in response to any civil or criminal proceedings that might arise if she attempted to take over the clinic.

We turn to the legal issue, whether the accused made those statements and gave that advice without "a basis in law and fact for doing so that is not frivolous." *Id.* We conclude that he did.

Even if the accused's advice that Leveque and Stanford had an "equal" right to operate the clinic had a non-frivolous basis in law or fact, that nevertheless would not justify his position that Leveque could use "self-help" to take physical control of the clinic's operations or the accused's participation in her efforts to do just that. Both the Bar's and the accused's experts agreed that the nonprofit corporation laws do not give an employee any legal authority to walk in and take over an operating nonprofit corporation, even if the corporation has been administratively dissolved for more than five years. Although certain statutes authorize "self-help" remedies in some contexts, *see, e.g.*, ORS 79.0609(2)(b) (secured party's right to self-help under Uniform Commercial Code), the accused cites no statute or case that supports his contention that Leveque, as a current or former employee of the clinic, was authorized to enter the clinic and claim that she was "taking over" because she disagreed with various aspects of the way the clinic was being operated. Further, the accused has not demonstrated that he acted in furtherance of a "good faith argument for an extension" of the self-help remedies that are permitted, in certain limited circumstances, under current law. *See* RPC 3.1 (defining "frivolous").

The accused also argues that the "choice of evils" doctrine supports his advice to Leveque and his and Leveque's conduct, although the precise nature of his argument is unclear. He appears to be attempting to demonstrate that his statement that he could defend Leveque from a trespass action for entering the clinic before business hours was not frivolous. He also appears to argue that the choice of evils defense applies to Leveque's attempt to take over the clinic.

In describing the defense, the accused cites *Black's Law Dictionary*, which defines "necessity" as "[a] privilege that may relieve a person from liability for trespass or conversion if that person, having no alternative, harms another's property in an effort to protect life or health." He argues that Leveque was attempting to "protect life or health" by taking over the clinic, because she believed that, if she complained to the Attorney General, he would shut down the clinic and the patients would have no way to get their medical needs met. To state the accused's argument is to refute it. Leveque had an "alternative"—*not* complaining to the Attorney General. Moreover, even if she had complained to the Attorney General, the accused does not indicate why Leveque would have been justified in believing that the Attorney General would act in a way that would harm "life or health" and why, as a result, her *only* alternative was to trespass and attempt to take over the clinic.[4]

The accused also cites two cases—*La Grande / Astoria v. PERB*, 281 Or 137, 576 P2d 1204 (1978), and *Sizemore v. Myers*, 327 Or 456, 964 P2d 255 (1998)—that he claims demonstrate "the breadth that Oregon courts apply to this concept of choice between competing values." In *La Grande/Astoria*, the court noted that competing policies

---

[4] In this court, the accused makes clear that he is not relying on ORS 161.200, which codifies "choice of evils" as a defense to a criminal prosecution. Under that statute, the defense is available only when illegal conduct is necessary to avoid an imminent injury and "[t]he threatened injury is of such gravity that, according to ordinary standards of intelligence and morality, the desirability and urgency of avoiding the injury clearly outweigh the desirability of avoiding the injury sought to be prevented by the statute defining the offense in issue." The accused could not justify Leveque's conduct using that statute; any harm caused by the Attorney General shutting down the clinic was not "imminent." Indeed, as of the time of the attempted takeover of the clinic, neither the accused nor Leveque had had any contact with the Attorney General at all regarding the corporation.

advanced by state and local governments "must often involve a choice among values," and then noted that "[s]uch choices are the essence of political, not judicial, decision." 281 Or at 148. The accused claims that that "choice among values" is "directly analogous to the [a]ccused's dilemma when navigating the uncharted waters of non-profit corporation law."

*Sizemore* involved a challenge to a ballot title explanatory statement composed by a committee directed by statute to prepare such a statement. In determining that that statute did not require the explanatory statement to explain the effect of the measure, the court examined the statute's legislative history. The court concluded that that history showed that "the *requirement* that the explanatory statement committees explain such effects left divided committees with a *choice of two evils*—either have an acrimonious debate concerning the potential effect of a measure or disobey the law and omit the effect from the explanatory statement altogether." *Sizemore*, 327 Or at 466 (first emphasis in original; second emphasis added).

We are not persuaded. Neither *LaGrande/Astoria* nor *Sizemore* has any bearing on the accused's claim that the positions he took in the course of representing Leveque were not frivolous. They were.

The accused claims that, to the extent that he is incorrect in his legal conclusions, he believed, when advising Leveque and acting on her behalf, that those conclusions were correct. We find, however, that the accused knew that the positions he took in the course of representing Leveque were frivolous. First, the accused's claim is undermined both by his advice to Leveque that her only redress for any concerns that she had about the corporation was to seek the assistance of the Attorney General and by his letter to Witte, in which he made a similar statement. Second, as discussed in greater detail below, on the morning of November 14, the accused lied to various individuals at the clinic, telling them that he had some written authorization permitting Leveque and her associates to take over the clinic. That supports the Bar's position that the accused knew that, without some such authorization, he and Leveque had no legal right—self-help or otherwise—to take over the clinic. Finally, the accused has

practiced law in Oregon for more than 40 years, has substantial experience in securities and corporate litigation, and has some experience working with nonprofit corporations. He is a sophisticated lawyer with extensive experience. We find that the accused knew that his advice to his client—that she had some legal basis for her attempt to take control of the clinic's operations—was frivolous.

## B. *RPC 4.1(a) and RPC 8.4(a)(3)*

The Bar alleged that, during the attempted takeover, the accused told various people that he had written authorization from some government entity to take over the clinic. The trial panel agreed and concluded that the accused had violated RPC 4.1(a) and RPC 8.4(a)(3). RPC 4.1(a) provides:

> "In the course of representing a client a lawyer shall not knowingly:
>
> "(a)   make a false statement of material fact or law to a third person[.]"

RPC 8.4(a)(3) provides:

> "It is professional misconduct for a lawyer to:
>
> "* * * * *
>
> "(3)   engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law[.]"

The accused responds that the Bar did not demonstrate that he violated either rule because it failed to prove, by clear and convincing evidence, that he had told anyone that he or Leveque had written authorization to take over the clinic. We disagree. Two clinic employees who were present at the time of the attempted takeover testified that the accused told them that he had authorization from the Attorney General or a court order to take over the clinic.

First, Janus Brown, the clinic manager, in describing the attempted takeover, testified as follows:

> "So when [the accused] addressed me by my name I just said, What is going on and how come you can do this?

"And he said something about the attorney general, like they've got permission to do this. And I was just floored, and I immediately went to my desk * * * and called Paul [Stanford] * * *.

"* * * * *

"And I'm going, Oh, my god, Paul, I don't know what's going on but, you know, she's got a lawyer here. And he said, you know, in essence, what it seemed to me that he had permission from the attorney general to be in and I don't know what's going on."

Scott Carr, a clinic administrator, testified that when he asked the accused to leave during the attempted takeover, the accused "stepped forward and said that he had a court order to be there[.]" When asked if the accused showed him the order, Carr testified,

"No. He was kind of, you know, fondling his * * * briefcase as if he, you know, had * * * you know, he held it up halfway * * * you know, as if he was prepared to produce it, but I didn't know what he was talking about."

He also testified,

"He had a leather briefcase as I remember. And when I had asked him to leave, he stepped forward and held it up halfway in front of his torso and said, I have a court order, I believe he said, from the attorney general to be here."

In addition, Witte similarly testified that she heard the accused state or imply to the police that he had an order from the Attorney General authorizing Leveque to take control of the clinic.

Although the accused cross-examined the witnesses at length as to the specific persons to whom the accused allegedly made his remarks and whether he referred to a "court order" or to some official document from the Attorney General, the three witnesses all clearly testified that they heard the accused state that he had a government document that authorized Leveque's actions.[5] We find that the Bar

---

[5] As noted previously, the accused testified that those witnesses were wrong and that he had stated only that he had a letter that he had written *to* the Attorney General regarding the alleged irregularities at the corporation. Based on the consistent testimony of two of the clinic's employees and the clinic's outside counsel, we find those witnesses, rather than the accused, to be credible on this point.

proved by clear and convincing evidence that the accused made such statements. We also find that the statements were false. The accused did not at that time (or at any later time) have any official authorization from the Attorney General or a court for Leveque or the accused to take control of the clinic or any other aspects of the corporation's operations.

■    A lawyer violates RPC 4.1(a) if, in the course of representing a client, he or she knowingly makes a "false statement of material fact." A lawyer violates RPC 8.4(a)(3) if he or she engages in conduct involving "dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law." Here, the Bar contends that the accused engaged in conduct involving "misrepresentation." The Bar therefore can demonstrate both violations by demonstrating that the accused made a material misrepresentation of fact. *See In re Kluge*, 332 Or 251, 255-56, 27 P3d 102 (2001) (describing requirements for violation of former rules). A fact is material if hearing that fact "would or could significantly influence the hearer's decision-making process." *Id.* at 255.

The accused argues that, even if he made the statements described above, he did not engage in "conduct involving * * * fraud [or] deceit" under RPC 8.4(a)(3). He maintains that the terms "fraud" and "deceit" are used "in their tortious sense" in the disciplinary rules. *See In re Brown*, 326 Or 582, 595, 956 P2d 188 (1998) (so noting). He argues that the Bar must therefore prove each element of the torts of fraud and deceit, including that the persons to whom the representation was made relied on the representation. *See id.* (describing elements). The accused contends that none of the employees relied on his alleged misrepresentation. Instead, they "insisted that the [a]ccused and his client depart [and] called the police," exactly as they would have if he had not made the misrepresentation.

■    Although this court did state in *In re Brown* that "fraud" and "deceit" were used in their tortious sense in *former* DR 1-102(A)(3), it also noted that a lawyer can violate the rule by engaging in "dishonest" conduct and that the Bar need not prove fraud or deceit to show a violation of the rule.

The court explained the meaning of fraud and deceit because, "if the accused did violate the rule, it may be important to place a specific name on the conduct, for purposes of determining the appropriate sanction." *Id.* Here, the Bar argues that the accused engaged in conduct involving "misrepresentation" (not conduct involving "fraud" or "deceit"). Proof of reliance is not necessary to establish that the accused engaged in conduct involving misrepresentation. *Kluge*, 332 Or at 256.

We conclude that the accused made statements to several individuals that he had an order or some other written authorization from the Attorney General or a court permitting the takeover. Those statements were false and the accused knew them to be false. The statements were intended to convince the employees of the corporation or the police that Leveque was authorized to take over the clinic and therefore that they should permit her to do so. They were material.[6] The accused therefore violated RPC 8.4(a)(3) and RPC 4.1(a).

## C.   *RPC 8.4(a)(2)*

The Bar argues that the accused violated RPC 8.4(a)(2) by (1) trespassing at the clinic and (2) advising Leveque to trespass at the clinic. A lawyer violates RPC 8.4(a)(2) when he or she "commit[s] a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects[.]" The accused maintains that neither he nor Leveque trespassed at the clinic.[7]

ORS 164.245(1) provides:

"A person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully in a motor vehicle or in or upon premises."

An individual "enters or remains unlawfully" if he or she "enter[s] or remain[s] in or upon premises when the premises, at the time of such entry or remaining, are not open to

---

[6] The accused makes no argument that, if proved, his conduct did not "reflect[ ] adversely on [his] fitness to practice law," under RPC 8.4(a)(3).

[7] The accused does not distinguish between his alleged trespass and his participation in Leveque's alleged trespass.

the public or when the entrant is not otherwise licensed or privileged to do so." ORS 164.205(3)(a). Although the Bar stated in its brief that the accused arrived at the clinic during "normal business hours," and thus when the premises were "open to the public," we disagree. Testimony before the trial panel demonstrated that the accused arrived before 7:45 a.m.—when Leveque and her associates were at the clinic and before the arrival of the clinic employee who was to open the clinic for business that day.

The accused argues, however, that Leveque was "otherwise licensed or privileged" to enter because she had a key that still worked and that no one had asked her to return. Because the accused entered the clinic with Leveque, then, he, too, was "licensed or privileged" to enter.

The Bar argues that Leveque's permission to enter by way of her key was limited to use as an employee of the clinic. It argues (1) that Leveque was no longer an employee at the time she attempted to take over and (2) that, even if she could be considered an employee, she did not have permission to use the key "for purposes hostile to" the corporation. We agree with the Bar that Leveque's permission to use her key to enter the clinic was limited and that she acted outside of the scope of her "license or privilege" when she entered the clinic's premises before business hours on November 14, 2005, to execute her plan to take over the clinic's operations. Because Leveque did not have authority to use her key to enter the clinic for that purpose, she also did not have authority to permit the accused to accompany her onto the clinic's premises for that purpose.

■ Moreover, we find that the accused knew that Leveque was not authorized to use her key to enter the clinic or to grant him entry. *See State v. Hartfield*, 290 Or 583, 595, 624 P2d 588 (1981) (to prove that a person is "not otherwise licensed or privileged" to enter, state must prove that "the person extending the permission or invitation was without actual authority to do so and that the entrant knew or believed there was no such actual authority"). The accused knew that Leveque was engaged in an employment dispute with the clinic and that she had not been to work at the clinic

in weeks. Indeed, the accused had issued a demand letter on Leveque's behalf, and he testified before the trial panel that he had advised Leveque not to return to work until the problems with Stanford were resolved. Even assuming that Leveque remained an employee, the accused knew of her status at the clinic; he knew that she was not entering the clinic on the morning of November 14 to perform her duties as an employee.[8] The Bar therefore proved, by clear and convincing evidence, that the accused committed criminal trespass when he entered the clinic before business hours.[9]

The accused does not dispute that, if he engaged in criminal trespass, that act "reflects adversely" on his "fitness as a lawyer." Because the criminal act here was committed "in furtherance of his legal services," the Bar argues, "[t]he connection between the criminal conduct and the [a]ccused's fitness to practice * * * requires no special analysis." We agree.

We find by clear and convincing evidence that the accused engaged in conduct that constituted the crime of criminal trespass in the second degree. Because he did so as part of his representation of a client, that conduct reflects adversely on his fitness as a lawyer. The accused violated RPC 8.4(a)(2).[10]

---

[8] The accused testified before the trial panel that he believed that Leveque was going to the clinic on November 14, 2005, to open the clinic and perform her normal duties as an employee. We do not find that testimony credible, however, considering the accused's conduct on November 14, along with the accused's testimony that he told Leveque, before the attempted takeover, that he could defend her against criminal or civil charges arising out of her entry and that he believed that the doctrine of self-help could apply to the situation.

[9] The accused argues that the Bar was required to prove every element of criminal trespass beyond a reasonable doubt. However, to prove a violation of RPC 8.4(a)(2), the Bar need only prove, by clear and convincing evidence, that the accused engaged in the relevant conduct and that that conduct constituted criminal trespass. See BR 5.2 (clear and convincing evidence standard in disciplinary cases); see also In re Leisure, 338 Or 508, 516, 113 P3d 412 (2005) (noting, under the predecessor to RPC 8.4(a)(2), that the Bar "must 'establish the criminal act by clear and convincing evidence' ").

[10] The Bar also contends that the accused violated RPC 8.4(a)(2) by the criminal act of acting as an accomplice to Leveque's criminal trespass. Because we have already concluded that the accused violated RPC 8.4(a)(2), we do not address that issue.

## III. SANCTION

▮▮▮▮ In determining the appropriate sanction, we identify a presumptive sanction based on "(1) the ethical duty violated; (2) the lawyer's mental state; and (3) the actual or potential injury caused" by the conduct. *In re Paulson*, 346 Or 676, 712, 216 P3d 859 (2009). We then adjust that sanction based on the presence of aggravating or mitigating circumstances. *Id.* As a final step, we consider whether the sanction is consistent with Oregon case law. *Id.* Here, the Bar argues that the accused should be suspended for "at least" the 90 days that the trial panel imposed. The accused does not address the issue of the appropriate sanction.

The accused in this case violated the duties he owed to his client and to the legal system, *see* American Bar Association's *Standards for Imposing Lawyer Sanctions* 4.0, 6.0 (1991) (amended 1992) (ABA Standards) (describing duties to client and to legal system), when he knowingly provided frivolous legal advice to Leveque. He also violated his duties to the public when he engaged in criminal conduct and made misrepresentations to further that conduct. *See* ABA Standard 5.0 (describing duties to public).

We turn to the accused's mental state. A lawyer acts "knowingly" if he acts with the "conscious awareness of the nature or attendant circumstances of the conduct but without the conscious objective or purpose to accomplish a particular result." ABA Standards at 7. With respect to the accused's advice to Leveque, for the reasons discussed above, we conclude that the accused "knowingly" took action on behalf of Leveque that did not have a nonfrivolous basis in fact or law.[11] We also conclude that the accused knowingly or intentionally committed trespass in the second degree. As discussed previously, he knew that Leveque had been asked to leave the clinic premises following a dispute with another employee. Although Leveque still had her key to the clinic

---

[11] The trial panel opined that the accused's mental state with respect to this violation was "negligent," because he continued to maintain that his advice was justified. However, RPC 3.1 specifically identifies "knowingly" as the mental state required to prove a violation of that rule. For the reasons stated in the text, we believe that the Bar proved by clear and convincing evidence that the accused acted "knowingly" when he gave the advice he did.

and her employment status was unclear, the accused knew that she was not authorized by Stanford or any other corporate official to use her key to enter the clinic for the purpose of taking it over. Finally, we agree with the Bar that the accused acted intentionally when he misrepresented to clinic employees and police that he had a document from the Attorney General or a court order authorizing Leveque to take over control of the clinic.

Turning to the injury caused by the accused's conduct, we conclude that the accused caused actual injury and created a risk of potential injury. First, his advice created the risk of potential injury to Leveque. Acting at least in part on the accused's advice, Leveque could have been (although she was not) prosecuted for trespass. In addition, she lost any chance to return to her employment at the clinic. The accused's advice, and his participation with Leveque when she acted on his advice, also created a risk of potential injury to Leveque and others because of the potential for a physical confrontation. The accused's misrepresentations, as well as his other conduct supporting Leveque's efforts, posed a risk of potential injury to the clinic because they might well have caused the employees to relinquish control of the clinic to Leveque, when there was no legal requirement that they do so. The clinic and its patients also suffered at least some actual injury, because its business operations were disrupted for over two hours during the attempted takeover.

The presumptive sanction is suspension. As to the accused's criminal conduct, suspension is appropriate when a lawyer "knowingly engages in criminal conduct" that is not listed in ABA Standard 5.11 (which trespass is not) and "that seriously adversely reflects on the lawyer's fitness to practice." ABA Standard 5.12. As to the accused's frivolous actions, the ABA Standards do not address the sanction for taking such action outside the context of litigation. RPC 3.1 prohibits both asserting frivolous positions in litigation and taking other frivolous "action" on behalf of a client. The closest analogy is the ABA standard that provides that a suspension is appropriate when a lawyer "knowingly violates a court order or rule, and there is injury or potential injury to a client or party." ABA Standard 6.22. We find that standard useful in suggesting, as a preliminary matter, that a lawyer who

violates RPC 3.1 by knowingly taking action, including advising a client, that is without a nonfrivolous basis in law or fact, should be suspended. Finally, regarding the accused's misrepresentation, a reprimand is generally appropriate when a lawyer knowingly engages in noncriminal conduct involving misrepresentation. ABA Standard 5.13.

The Bar argues that there are two aggravating factors: the accused refused to recognize the wrongful nature of his conduct, ABA Standard 9.22(g); and the accused had substantial experience in the practice of law, ABA Standard 9.22(i). There is no dispute as to the second factor. As to the first factor, the accused, in his responses to the Bar's investigation and before the trial panel, continued to assert that he had given sound legal advice to his client. That was his principal defense to the Bar's charges. In our view, the accused's reliance on those arguments—although unavailing—cannot be used to enhance the penalty that would otherwise be imposed for his violations. The Bar also notes three mitigating factors, which we also find to be present here: the accused had no prior disciplinary record, ABA Standard 9.32(a); the accused did not have a dishonest or selfish motive, ABA Standard 9.32(b); and the accused had a cooperative attitude toward the disciplinary proceedings, ABA Standard 9.32(e).

We therefore conclude that a suspension of some term is appropriate in this case. The Bar notes several Oregon cases that it argues are similar to this one.[12] It argues that the accused's conduct is most similar to that of the accused in *In re Strickland,* 339 Or 595, 124 P3d 1225 (2005). In *Strickland,* the accused was involved in a dispute concerning the construction of a reservoir across the street from his mother's (and his) home. The accused staged a disturbance

---

[12] The Bar cites several cases "in which a lawyer has pursued a frivolous claim to the extent of committing criminal conduct" that resulted in disbarment or a lengthy sanction. Those cases, however, involved more serious misconduct, more aggravating circumstances, or both. *See, e.g., In re Kluge,* 332 Or 251, 27 P3d 102 (2001) (three-year suspension for lawyer who falsely represented that he was a notary, engaged in the practice of law without PLF coverage, falsely represented to PLF that he did not require coverage, and failed to withdraw when required to give testimony prejudicial to client; aggravating factors included pattern of misconduct, bad-faith obstruction of disciplinary proceeding, refusal to acknowledge wrongful behavior, and substantial experience; the only mitigating factor was lack of disciplinary history).

between himself and the construction workers and then called 9-1-1, claiming that the workers had threatened him. When police arrived, the accused claimed, falsely, that a construction worker had assaulted him. The Bar alleged that the accused had engaged in criminal conduct reflecting adversely on his fitness to practice law and in conduct involving dishonesty. After noting several aggravating factors (selfish motive, substantial experience, refusal to acknowledge wrongdoing, multiple offenses) and mitigating ones (no disciplinary record, cooperated with disciplinary proceedings, received other sanctions in criminal justice system), this court imposed a one-year suspension. The Bar argues that the accused's conduct here was similar to that of the accused in *Strickland* because he "unlawfully created a situation that predictably required police intervention."

Although *Strickland* bears some similarities to this case, it involved a lawyer acting with a selfish motive and with the intent to protect his own interests (and those of his mother). Moreover, the accused in *Strickland* clearly initiated the disruptive plan himself and was the principal actor in the plan, whereas here the accused, based on the facts as we have found them, was not the instigator of the takeover plan, although he was a participant in Leveque's effort. We do not discount the seriousness of the accused's conduct or the potential for a physical confrontation caused by his advice, but in fact the matter was resolved quickly and peacefully and, so far as this record shows, without later charges of any kind.

A case involving somewhat similar conduct to that at issue here is *In re Glass*, 308 Or 297, 779 P2d 612 (1989). In *Glass*, the accused registered an assumed business name for a fraudulent purpose.[13] The court noted that the accused had acted with a selfish motive but also determined that two mitigating factors applied—the accused had acted on the advice of his lawyer and later recognized that his conduct was wrongful. There is one important difference between *Glass*

---

[13] An individual, John Pearce, had filed a construction lien against the accused and initiated an action to foreclose the lien in the name "John Pearce, dba Quicksilver Construction Company." Pearce had not registered the name Quicksilver Construction Company; the accused registered that name to avoid the suit.

558

and this case, however. In *Glass*, the accused had failed to cooperate with the Bar in the disciplinary proceedings. The court noted that a 60-day suspension had been deemed appropriate for similar conduct in *In re Hopp*, 291 Or 697, 634 P2d 238 (1981) (accused registered an assumed business name to harass opponent), but determined that the accused's conduct in *Glass* was "compounded" by his failure to cooperate, resulting in a 91-day sanction. *Glass*, 308 Or at 305 n 7. However, the conduct here is more serious than that in *Glass* and *Hopp*, because the accused engaged in criminal conduct and his conduct resulted in greater potential injury (police involvement, risk of physical confrontation).[14]

In our view, the conduct involved here was more serious than in *Glass* and *Hopp*, but less serious than in *Strickland*.[15] We conclude, as did the trial panel, that the appropriate sanction is a suspension of 90 days.

The accused is suspended from the practice of law for a period of 90 days, commencing 60 days from the date of this decision.

[14] In *Glass* and *Hopp*, each attorney registered an assumed business name for an inappropriate purpose; we note that, in this case, we do not find that the accused was involved in the third-party's registration of the corporation's name. Instead, the conduct in *Glass* and *Hopp* is analogous to the accused's conduct because here, as in those cases, the accused attempted to take advantage of the corporation's failure to maintain appropriate administrative records.

[15] In *Glass*, as noted, the court concluded that the accused's conduct was similar to the conduct in *Hopp* and ordinarily would result in a 60-day suspension. The court imposed a 91-day suspension in *Glass* because the accused did not cooperate with the Bar's investigation. Although the conduct here was more serious than that in *Glass*, a similar sanction is appropriate, because this case does not involve the same aggravating factors as in *Glass*.