Filed: July 19, 2012

IN THE SUPREME COURT OF THE STATE OF OREGON

In Re Complaint as to the Conduct of

MARK G. OBERT,

                                                                    Accused.

(OSB 08-134, 09-122, 09-123; SC S059072)

On review of the decision of a trial panel of the Disciplinary Board.

Argued and submitted March 9, 2012.

Jason Thompson, Ferder Casebeer French & Thompson, LLP, Salem, argued the cause and filed the brief for the accused.

Mary Cooper, Assistant Disciplinary Counsel, argued the cause and filed the brief for the Oregon State Bar.

Before Balmer, Chief Justice, and Durham, Kistler, Walters, Linder, and Landau, Justices.*

PER CURIAM

The accused is suspended from the practice of law for a period of six months, commencing 60 days from the date of this decision.

*De Muniz, J., did not participate in the consideration or decision of this case.

PER CURIAM

In this lawyer disciplinary proceeding, the Oregon State Bar (the Bar) charged Mark G. Obert (the accused) with nine violations of the Oregon Rules of Professional Conduct (RPC) arising out of his representation of two separate clients, Randy Favre and Ian Wilson. On the Favre matter, the Bar alleged violations of RPC 1.5(a) (charging or collecting a clearly excessive fee), RPC 1.15-1(a) (failure to deposit and maintain client funds in a separate trust account), RPC 1.15-1(c) (requiring lawyer to withdraw client money only as fees are earned or expenses incurred), RPC 1.15-1(d) (failure to promptly deliver funds to a client), and RPC 8.1(a)(2) (failure to respond to lawful requests of disciplinary authority). On the Wilson matter, the Bar alleged violations of RPC 1.1 (failure to provide competent representation), RPC 1.4(a) (failure to keep client reasonably informed), RPC 3.1 (taking action on behalf of a client with no nonfrivolous basis), and RPC 8.4(a)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation).

The trial panel found the accused guilty of eight charges. The one charge for which the panel found the accused not guilty was the alleged violation of RPC 8.4(a)(3). The panel imposed a sanction of six months' suspension. The accused timely requested review by this court and challenges the panel's conclusion that he committed eight violations of the RPC. He asserts that he did not commit any ethical violations and that, even if this court concludes otherwise, the appropriate sanction is a public reprimand. The Bar responds that the panel correctly concluded that the accused committed eight violations. It contends, however, that the panel erred in not also

1

concluding that the accused violated RPC 8.4(a)(3). The Bar also argues that the appropriate sanction is one years' suspension.

We review a decision of the trial panel *de novo*, ORS 9.536(2); BR 10.6. The Bar must establish misconduct by clear and convincing evidence, BR 5.2, which is "evidence establishing that the truth of the facts asserted is highly probable." *In re Cohen*, 316 Or 657, 659, 853 P2d 286 (1993). For the reasons that follow, we conclude that the Bar met its burden of proof with respect to all but two of the charges and that the appropriate sanction is suspension of the accused from the practice of law for six months.

## I. FACTS

As we have noted, the charges in this case arise out of two unrelated matters: the Favre matter and the Wilson matter.

A.    *Favre Matter*

On Friday, January 25, 2008, Oregon resident Randy Favre was arrested on a 24-year-old warrant issued by the State of Florida. He was taken into custody in Marion County. Immediately following the arrest, he signed a nonjudicial waiver of his right to contest his extradition.

On Saturday, January 26, Randy's wife, Karen, spoke with the accused over the phone and hired him to represent her husband in the Oregon extradition proceedings. Her goal was for the accused to obtain Randy's release and to deal with the Florida charges after he was out of custody. At that time, Karen was unaware that her husband had signed a waiver of extradition. The accused told her that she could either pay a flat fee of $1,200 or his hourly rate of $210 per hour. She chose to pay a flat fee and gave the

accused her credit card information. She did not sign a fee agreement.

On Sunday evening, January 27, the accused met with Randy Favre at the Marion County Jail. At that point, Randy informed the accused that he had signed a waiver of extradition. The accused told him that, because of the waiver, there was little that he could do. Still, the accused agreed to determine the status of the Florida case and attempt to obtain Randy's release, subject to a voluntary appearance in Florida secured by a release agreement or otherwise. He also informed Randy that he was not licensed to practice law in Florida and that Randy would have to obtain counsel in Florida to address the pending criminal charges.

On Monday morning, January 28, Randy Favre was released from custody because Florida decided not to extradite. The accused later claimed to have left a telephone message that same morning with the Hillsboro County, Florida, Sheriff's Office to discuss the charges pending against Randy. But there is no other evidence that the accused did so; he produced no phone records, and his scant notes on the Favre matter do not mention his phone call.

Randy Favre called the accused and left a message that he had been released. When the accused listened to the message, he believed that, because Randy was out of custody, his representation was complete. Accordingly, on the following day, January 29, the accused processed Karen Favre's credit card for $1,200 and deposited the funds into his business bank account.

The Favres did not believe that the accused's representation was complete. They attempted repeatedly to contact the accused by telephone and in person. The

3

accused did not return their calls. Finally, in April 2008, Karen Favre contested the credit card transaction, asserting that the accused did not provide any legal services, and forwarded a copy of the letter to the accused. The accused did not respond to the letter or notify the credit card company that he disputed her allegations. In May 2008, the credit card company reclaimed $1,200 from the accused's business bank account.

On July 18, 2008, the Favres complained to the Oregon State Bar, asserting that the accused charged them $1,200 without providing any legal services. On July 23, the Bar forwarded a copy of the complaint to the accused and requested that he respond by August 6. The accused did not respond.

On August 12, 2008, the Bar sent, by certified mail return receipt requested, a follow-up letter concerning the Favre complaint. The Bar noted that it had not yet received a response to its July 23 letter and that failure to respond could result in the matter being referred to disciplinary counsel. The accused's secretary, Blair Wolfe, signed for the receipt of the letter. The accused, however, did not respond to it. The matter was then referred to disciplinary counsel.

On September 3, 2008, disciplinary counsel for the Bar sent the accused a letter requesting a response to the allegations in the Favre complaint by September 24. Disciplinary counsel noted that a failure to respond by that date could result in the matter being referred to the Local Professional Responsibility Committee (LPRC) for formal investigation. The accused, however, did not respond to the letter.

On October 7, 2008, disciplinary counsel sent a follow-up letter to the accused. Again, disciplinary counsel reminded the accused that failure to respond could

4

result in the matter being referred to the LPRC. Alma Vasquez, a new secretary whom the accused had recently hired, signed a receipt for that letter. The accused did not respond to it, however.

On October 30, 2008, the matter was referred to the LPRC. An LPRC investigator, David Carlson, called the accused and left a message with his secretary in late November 2008. During the following weeks, the accused and Carlson played "phone tag."

On December 16, 2008, Carlson met the accused at the Marion County Courthouse, where the accused was beginning a trial. Carlson briefly discussed the Favre matter with the accused and requested that he provide a written response. Later that day, the accused sent a letter to the Bar responding to the Favre matter. The letter did not, however, include any explanation about his failure to respond to the prior Bar inquiries.

On December 17, 2008, Carlson requested additional information from the accused, specifically, bank records concerning the Favre matter and an explanation for his failure to respond to the letters that the Bar had sent him in July, August, September, and October. The accused did not respond.

On January 23, 2009, the LPRC subpoenaed the accused, requiring him to appear on February 12 and to provide additional documentation regarding the Favre matter. Three days later, on January 26, the accused sent the LPRC a letter with the requested bank records along with a brief explanation that his earlier failures to respond were due to unspecified "issues with office staff during the latter part of the summer and fall." He later explained that his secretary, Wolfe, had failed to forward the Bar's letters

5

to him and that he did not discover them until she had left the office, in late October.

Considering those facts, the trial panel concluded that the accused had violated RPC 1.5(a) (charging or collecting a clearly excessive fee), RPC 1.15-1(a) (failure to deposit and maintain client funds in a separate trust account), RPC 1.15-1(c) (requiring lawyer to withdraw client money only as fees are earned or expenses incurred), RPC 1.15-1(d) (failure to promptly deliver funds to a client), and RPC 8.1(a)(2) (failure to respond to lawful requests of disciplinary authority). The panel found that the Favres were credible, but that the accused was not. Specifically, the panel found that, other than meeting with Randy Favre over the weekend, the accused "did no work on th[e] matter." The panel disbelieved the accused's assertion that he had telephoned Florida authorities to inquire about the extradition; the panel noted that the accused could produce no phone records to confirm the calls, that he did not mention having made the calls until shortly before the hearing, and that it found him "less than credible on this issue." It also disbelieved his contention that he had failed to respond to repeated Bar communications because he had been unaware of them as a result of problems with office staff.

B.  *The Wilson Matter*

Vicki and Michael Edwards operated several businesses. Ian Wilson provided computer services for those businesses. The parties had a falling out, ultimately resulting in the Edwardses -- individually and on behalf of their businesses -- filing a civil action against Wilson. Their complaint alleged a number of claims, including intentional interference with economic relations on behalf of one of the businesses and intentional infliction of emotional distress on behalf of Vicki Edwards. Wilson, a personal friend of

6

the accused, retained the accused to represent him in the litigation.

The case was tried to a jury. At the close of evidence, the trial court discussed certain issues *in camera* with the accused and opposing counsel. One issue was the viability of the intentional interference claim and whether the court would grant a directed verdict or a motion for a judgment notwithstanding the verdict (JNOV). The trial court stated that it was "going to send this to the jury under the rule, which means that if the plaintiff gets a verdict, I will take it away from the plaintiff on a motion for [J]NOV." The parties also discussed Vicki Edwards's intentional infliction of emotional distress claim. The trial court stated that it was "going to allow that claim to go to the jury as to Mrs. Edwards. I will take a look at it on [J]NOV. I'm not making any promises on that one."

Ultimately, the jury found in favor of the Edwardses on all counts. The jury awarded plaintiffs $50,000 in damages on the intentional infliction of emotional distress claim and $30,000 in damages on the intentional interference claim. After the jury left, the trial court again reiterated that, if Wilson filed a JNOV motion, the court would grant it and enter judgment in favor of Wilson on the intentional interference claim. The court said that it would also reexamine the intentional infliction of emotional distress claim. The trial court cautioned the accused about the timing requirements of the rules for filing post-trial motions:

"Counsel, you both need to read the timing of the motion for judgment NOV, because I did indicate that as to intentional interference with economic relations, I am going to enter a judgment notwithstanding the verdict for the defendant on that count.

7

"And then we still have issues, one way or the other, on the -- and I assume you're going to be filing an NOV on the intentional infliction of emotional distress."

Counsel replied, "That's correct." The court continued with its caution about filing deadlines:

"The motion must be heard and determined by the court within 55 days of the time of the entry of the judgment and not thereafter, and if not so heard or determined within that time, the motion shall be conclusively denied. So we need to get a judgment in on this, and then you've got ten days after the judgment is -- not signed or filed, but entered, in which to file whatever appropriate motions in that regard.

"And the same thing, if you have motions for a new trial[.]"

The trial court entered judgment on March 26, 2007. The accused, however, did not file a JNOV motion on either the claim for intentional interference or for intentional infliction. Instead, on March 30, the accused filed a notice of appeal.

Then, on April 9 -- 14 days after entry of the judgment -- the accused moved for JNOV and for a new trial on both claims. The Edwardses opposed those motions, arguing that the trial court lacked jurisdiction, because the accused filed a notice of appeal. They also argued that, in any event, the motions were untimely.

On April 10, 2007, the Court of Appeals informed the accused that his notice of appeal was deficient for failure to comply with several provisions of the Oregon Rules of Appellate Procedure. The court gave him 14 days to correct the errors by filing an amended notice of appeal.

In the meantime, on April 16, 2007, the trial court held a hearing on the motions filed by the accused. The trial court agreed with the Edwardses that it lacked

8

jurisdiction to address the motions because the accused had filed a notice of appeal.  The trial court instructed the accused that, if he wanted the trial court to address those motions, he would need to dismiss the appeal so that jurisdiction would return to the trial court.  The accused responded that he would do so immediately.

Nevertheless, on April 23, 2007, the accused filed an amended notice of appeal to correct the deficiencies in his original notice.  The following day, the trial court issued an order memorializing its decision of the previous week denying the post-trial motions for lack of jurisdiction.  On April 27, the Court of Appeals -- apparently unaware that the trial court had denied the motions for JNOV and a new trial -- *sua sponte* dismissed the appeal because of the pending motions.  The court's order specifically instructed that any pending post-trial motion must be decided within 55 days of the entry of judgment or be deemed denied the following day.  That 55-day deadline, the Court of Appeals explained, began to run upon entry of the judgment, but was tolled by the filing of the notice of appeal.  The time would recommence, the court explained, upon the issuance of the appellate judgment terminating the appeal.  The same day, the Court of Appeals issued the appellate judgment.

On May 29, Wilson sent the accused an e-mail asking whether the matter had been set for a hearing before the trial court.  Two days later, Wilson sent another e-mail asking about the status of the case.  That same day, Wilson sent a second e-mail asking whether a stay of proceedings had been entered.  The following week, Wilson sent a follow-up e-mail again asking about a stay of proceedings.  There is no e-mail or written response from the accused.  He later explained, however, that, in the months

9

following the entry of judgment, he regularly reported back to Wilson by telephone with updates on the status of the case; Wilson later agreed that there were indeed multiple telephone calls during that time.

On June 7, 2007, the accused sent the trial court a letter reporting that the Court of Appeals had dismissed the appeal and remanded the case to the trial court. The accused requested that the trial court set a hearing on his motions for JNOV and a new trial as soon as possible. He also enclosed a "Motion to St[ay] Enforcement of Judgment Pending Appeal," although he did not have Wilson post the required bond. ORS 19.335(1).

The Edwardses opposed the motions for JNOV and for a new trial, arguing that the motions were not timely, having been filed 14 days after entry of the judgment, instead of the 10 days that the rule requires. They also asserted that the motion to stay was without merit because there was no appeal currently pending and Wilson had not posted a bond as required by statute. The trial court denied the motion to stay on June 18, but took no immediate action on the motions for JNOV and for a new trial.

A month later, on July 20, 2007, the accused sent an e-mail to Wilson reporting that he had just checked the appellate court database, "and it doesn't look like they have sent the case back to circuit court." The accused later explained that, at the time, he had been working under the misapprehension that -- notwithstanding the explanation in the April 27 order of the Court of Appeals to the contrary -- the 55-day deadline for the trial court to rule on the pending motions for JNOV and for a new trial did not recommence until the case file had been physically returned to the trial court.

10

The Edwardses were not working under the same misapprehension. On July 25, 2007, they sent a letter to the trial court clerk requesting that the clerk enter an order acknowledging that the 55-day deadline for a decision regarding the motions for JNOV and for a new trial had passed and, therefore, were deemed denied pursuant to ORCP 63 D(1); ORCP 64 F(1). They sent a copy of that letter to the accused and informed him that the case was "completed" because more than 55 days had passed since he filed the two motions, and his time to file an appeal had also passed.

On August 6, 2007, the accused and Wilson exchanged several e-mails about the case. The accused asked Wilson about making payments on the outstanding balance owing. Wilson asked about the status of the case. The following day, Wilson sent another e-mail asking whether the trial court had scheduled a hearing on the pending motions. On August 10, Wilson again e-mailed, this time asking whether a stay of proceedings had been granted. On September 17, Wilson again e-mailed the accused stating: "I need you to schedule a hearing for our Motion that we filed 7 months ago. Please do that today."

The accused apparently telephoned Wilson and explained that the motions had been denied and that the time for appealing the decision may have passed. On September 18, 2007, the accused wrote Wilson a letter informing him that,

> "As you know, we were going to be appealing the trial court's decision in your case. Pursuant to our recent discussion, it is possible that your appeal may be barred based upon not filing the Notice of Appeal within 30 days of the court's denial of our Motions for New Trial and Judgment Notwithstanding the Verdict. Consequently, you may have a claim against me for legal malpractice based upon my failure to timely file the Notice of Appeal in your case."

11

The accused explained that he could continue to represent Wilson only if Wilson agreed to waive the conflict and consent to his continued representation. Wilson consented to have the accused continue to represent him.

On September 28, 2007, the accused filed a second notice of appeal and moved to set aside default and for a retroactive extension of time to file the notice of appeal. In support of the notice and motion, the accused submitted an affidavit explaining that he had failed to file a timely notice of appeal following the expiration of the 55-day deadline to decide his post-trial motions because of a misapprehension of the applicable rules. He explained that he had,

> "awaited the return of the file from the Court of Appeals so the trial court could schedule the Motion for JNOV and New Trial. It was my belief that once the court received the actual file back from the Court of Appeals, the 55 day time period would then start to run again rather th[a]n from the date of the Appellate Judgment * * *."

The accused further asserted that the failure to file the notice of appeal in a timely manner was not attributable to Wilson personally. The accused later explained that he was intending to argue to the Court of Appeals that ORS 138.071 could be read to allow for the filing of a late notice of appeal. He admitted that the statute, by its terms, applies only to criminal cases. He explained that he intended to argue that, notwithstanding the wording of the statute, the court should "extend" the statute to apply to civil cases as well. The Court of Appeals dismissed the appeal as untimely on October 12.

Wilson ultimately complained to the Bar. After a hearing, the trial panel concluded that the accused violated RPC 1.1 (failure to provide competent representation), RPC 1.4(a) (failure to keep client reasonably informed), and RPC 3.1

12

(taking action on behalf of a client with no nonfrivolous basis). The panel concluded that the Bar had failed to prove that the accused had violated RPC 8.4(a)(3) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation). Again, the trial panel made credibility findings. Specifically, it found that *both* the accused and Wilson were not credible. As between the two, the panel explained, it found the accused to be more credible than Wilson, "but did not always find the [a]ccused's claims or explanations for his actions and failures to act, believable." As for the Bar's failure to prove the violation of RPC 8.4(a)(3), the panel explained that, although the accused had knowingly filed frivolous documents -- in particular, the motion to stay pending appeal and the late-filed September 28 notice of appeal -- the Bar had failed to establish that the accused had done so with an intent to deceive. The accused's actions, the panel explained, "were done more in a grasping at straws mentality rather than with any intent to actually deceive."

## II. ALLEGED VIOLATIONS

A. *The Favre Matter*

1. *RPC 1.5(a) (excessive fee)*

The Bar argues that the accused violated RPC 1.5(a) by collecting $1,200 against Karen Favre's credit card after having done nothing at all to earn the fee. The accused argues that he did not violate the rule because he had "performed tasks necessary to effectuate the representation." According to the accused, he "visited Mr. Favre at the Marion County Jail on a Sunday, investigated the extradition matter, and contacted the Florida authorities early Monday morning."

RPC 1.5(a) provides that, "[a] lawyer shall not enter into an agreement for,

13

charge or collect an illegal or clearly excessive fee or a clearly excessive amount for expenses."  Importantly, the fee must not be "clearly excessive" at both the time the client and the attorney enter into an agreement and at the time that the attorney charges and *collects* the fee.  *In re Gastineau*, 317 Or 545, 550-51, 857 P2d 136 (1993).  Thus, a fee could be reasonable at the time the parties enter into the agreement but "clearly excessive" when the attorney collects that fee.

In this case, the issue is whether the accused *collected* a "clearly excessive" fee.  This court has held that a lawyer violates RPC 1.5(a) when the lawyer "collects a nonrefundable fee, does not perform or complete the professional representation for which the fee was paid, but fails promptly to remit the unearned portion of the fee." *Gastineau*, 317 Or at 551.  Whether a lawyer has performed or completed the professional representation turns on whether the lawyer took "substantial steps to complete the agreed-upon work." *In re Balocca*, 342 Or 279, 291, 151 P3d 154 (2007).

The accused agreed to represent Randy Favre in the Florida extradition matter.  Specifically, he agreed to undertake efforts to obtain Favre's release.  When the accused met with Favre, he learned that Favre had already signed a waiver of extradition. The accused candidly informed Favre that, due to the waiver, there was little that the accused could do for him.  Still, the accused suggested that he could call the Florida authorities and attempt to negotiate some type of voluntary release agreement.

On Monday, January 28, 2008, however, the Florida authorities released Favre, before the accused had commenced any work on the matter.  The accused insists that he did, in fact, commence work on the matter in three ways: (1) he visited Favre at

14

the Marion County Jail, (2) he investigated the extradition matter, and (3) he called the Florida authorities and left a voicemail with the person in charge of extraditions in an attempt to negotiate Favre's release.

There is, however, no credible evidence that the accused did anything other than meet with Favre. The record contains no evidence of any investigation; certainly the accused offered neither documents nor testimony describing precisely what he investigated. The record likewise contains no evidence of any telephone calls other than the accused's assertion that he made them. As we have noted, the trial panel found those assertions to be "less than credible."

Generally, "[t]his court gives weight to the trial panel's express credibility assessments." *In re Hostetter*, 348 Or 574, 596, 238 P3d 13 (2010). When the trial panel's credibility determination is based on the witness's demeanor and supported by explicit findings on that subject, this court will give deference to the credibility determination. *Id.* If, however, the panel's credibility determination "'is based on the objective factors involving the intrinsic believability of competing inferences or evidence * * * this court owes no deference to that assessment, but the panel's discussion may be enlightening and have persuasive force.'" *Id.* (quoting *In re Fitzhenry*, 343 Or 86, 103-04 n 13, 162 P3d 260 (2007)).

In this case, the trial panel did not make demeanor-based findings. Still, it expressly found that the accused was not credible because he failed to mention the phone call until shortly before the disciplinary hearing and he could not produce phone records or office records to verify his assertion that they had actually occurred. We find the trial

15

panel's credibility determination persuasive and agree that the accused's testimony regarding the phone call is not credible.

The question, then, is whether simply meeting with a client constitutes a "substantial step" towards completing work on the matter. With respect to that question, we find this court's opinion in *Balocca* instructive. In that case, the lawyer agreed to prepare, file, and complete a client's bankruptcy proceeding for a flat fee of $550, plus expenses. *Balocca*, 342 Or at 282. The client paid $300 in advance. *Id.* at 283. The lawyer met with the client once, but performed no other work. When accused of having collected an excessive fee, in violation of the predecessor to RPC 1.5(a), the lawyer responded that the fee was not excessive in light of the fact that he had met with the client, and, based on the hourly rate for his work, he had earned the $300. *Id.* at 291-92. This court rejected the argument. The lawyer, the court said, had agreed to complete the bankruptcy, but "[h]e did no substantial work on that matter." *Id.* at 292. The court concluded that the lawyer had not earned the $300 and that he had collected an excessive fee. *Id.*

We agree with the trial panel that there is clear and convincing evidence that the accused did not take any substantial step towards completing work on the matter for which he accepted a $1,200 fee. He agreed to undertake efforts to obtain Favre's release from custody but he made no such efforts. Consequently, the accused violated RPC 1.5(a) by collecting a flat fee for work that he did not complete.

2. *RPC 1.15-1 (misuse of client funds)*

The Bar argues that the accused violated RPC 1.15-1(a), (c), and (d), when

16

he processed the $1,200 charge against Karen Favre's credit card, deposited the funds into his general account, and refused to return the funds upon request. The accused responds that, because he had earned the fees he did not violate the rules by failing to put the funds into a client trust account. For the same reason, he contends, he was not obligated to return the funds upon request.

RPC 1.15-1 provides, in part:

"(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession separate from the lawyer's own property. Funds, including advances for costs and expenses and escrow and other funds held for another, shall be kept in a separate 'Lawyer Trust Account' maintained in the jurisdiction where the lawyer's office is situated.

"* * * * *

"(c) A lawyer shall deposit into a lawyer trust account legal fees and expenses that have been paid in advance, to be withdrawn by the lawyer only as fees are earned or expenses incurred, unless the fee is denominated as 'earned on receipt,' 'nonrefundable' or similar terms and complies with Rule 1.5(c)(3).

"(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this rule or otherwise permitted by law or by agreement with the client, a lawyer shall promptly deliver to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall promptly render a full accounting regarding such property."

Under subsections (a) and (c) of those rules, a lawyer is required to deposit client funds into a trust account and may withdraw fees from that account only after they have been earned. As this court explained in *Balocca* of the predecessor to those rules, "[t]he critical aspect of such an arrangement is that the retainer payment is the *client's* money until the lawyer performs legal services that the client has agreed to pay for." 342 Or at

17

287 (emphasis in original). Only if a lawyer enters into a written agreement explicitly denominating fees as "earned on receipt" may the lawyer be excused from depositing funds received from the client into a trust account. RPC 1.5(c)(3). *See also In re Peterson*, 348 Or 325, 334, 232 P3d 940 (2010) ("In the absence of a written fee agreement that expressly designates a fee as a nonrefundable retainer earned upon receipt, funds paid from a client to a lawyer remain subject to trust account rules regarding funds held for another."). Under subsection (d), the lawyer is obligated, upon a client's request, to "promptly deliver" to the client any portion of the funds to which the client is entitled.

In this case, the accused received funds from Karen Favre when he processed her credit card information and deposited those funds into his own general account. The sole defense that he offers for his failure to deposit the funds into a client trust account and his failure to return those funds on request is his assertion that, by the time that he obtained those funds, he had earned them. Putting aside the fact that there is no written agreement expressly designating the fees as having been earned on receipt, the fact remains that, as we have determined, the accused had not, in fact, earned $1,200 by the time that he had deposited the funds. We therefore conclude that the accused violated RPC 1.15-1(a), (c), and (d).

3. *RPC 8.1(a)(2) (failure to respond to Bar inquiry)*

The Bar argues that the accused violated RPC 8.1(a)(2) when he repeatedly failed to respond to its inquiries concerning the Favre complaint. The accused advances two arguments in defense. First, he contends that the rule does not contain a timing

18

requirement, and, because he *eventually* responded to all of the Bar's inquiries, he did not violate it. In the accused's view, the rule is violated only by a lawyer "who fail[s] to respond *at all* to the Bar's requests." (Emphasis added.) Second, he contends that, even if there is a timing requirement, the rule requires a "knowing" failure to comply with that requirement. In this case, he argues, his failure to respond in a timely manner was merely negligent, a function of the poor office assistance that he received from his secretary, Wolfe. According to the accused, Wolfe simply never gave him the Bar's letters. He also notes that, at least after mid-December, he responded to all of the Bar's inquiries.

RPC 8.1(a)(2) provides, in part:

"[A] lawyer * * * in connection with a disciplinary matter, shall not:

"* * * * *

"knowingly fail to respond to a lawful demand for information from an admissions or disciplinary authority, except that this rule does not require disclosure of information otherwise protected by Rule 1.6."

The rule does not, by its terms, include a particular deadline for responding to requests for information. But it does not preclude the Bar from including in its "lawful demand for information" a timing requirement. And, in fact, the rules expressly authorize the Bar to do so. *See* BR 2.6(a)(1) (providing that Disciplinary Counsel may request that a lawyer respond to ethical violation allegations within 21 days).

That certainly is the manner in which this court consistently interpreted *former* DR 1-103(C) (2004), the predecessor to RPC 8.1(a)(2). Like RPC 8.1(a)(2), the earlier rule did not include a particular deadline for responding to requests for information; the rule simply required lawyers to respond to "reasonable requests" for

information from the Bar. This court, however, interpreted the rule to include reasonable deadlines. *See, e.g.*, [In re Worth](), 336 Or 256, 273, 82 P3d 605 (2003) ("That rule requires complete and truthful responses to reasonable requests for information from the Bar. A reasonable request includes the Bar's reasonable deadlines for a response."). In such cases, the court has held that an accused lawyer may not avoid a violation of the rule simply by *eventually* responding to a Bar request for information. *In re Rhodes*, 331 Or 231, 237, 13 P3d 512 (2000) ("The accused did not remedy his failure to respond to the Bar's or the LPRC's initial letters by eventually cooperating with the LPRC."); *In re Schaffner*, 325 Or 421, 425, 939 P2d 39 (1997) ("Partial cooperation, such as responding only when and if the matter escalates to an LPRC investigation, reduces the extent of the violation but does not absolve a lawyer from his or her obligation under the rule.").

In this case, there is no dispute that the accused did not comply with the Bar's repeated requests for information in a timely manner. The Bar sent him requests for information in July, August, September, and October 2008, all of which produced no response. It was not until mid-December 2008, when an LPRC investigator contacted the accused at the Marion County Courthouse, that the accused submitted a response; even then, the response was incomplete. The accused did not fully comply with the Bar's requests for information until after the issuance of a subpoena, in February 2009.

The only issue, then, is whether the Bar established clear and convincing evidence that the accused "knowingly" failed to respond to its inquiries. As we have noted, the accused contends that his failure to respond earlier to the Bar's inquiries was a result of poor secretarial assistance from Wolfe. The trial panel found that explanation to

20

be less than credible. We need not determine whether we agree with that credibility determination because, even assuming that the accused was truthful as to the problems that he had with Wolfe, there is no explanation for significant delays in his responses to the Bar's repeated requests after she left the office.

Disciplinary counsel for the Bar sent the accused a letter October 7, 2008, requesting information on the Favre complaint. The letter was received by Vasquez, the accused's new secretary, not Wolfe. Indeed, the accused concedes that, at least by late October or the first of November, he knew of the Bar's inquiries. It is important to emphasize in that regard that what the accused admits he learned at that time was that, for several months, the Bar had been asking for information and that -- precisely because of his repeated failures to respond -- the matter had been referred to disciplinary counsel. Yet, even knowing that, the accused did not respond until mid-December. The accused offered no explanation at all for that delay.[1] Even then, his response was only partial, prompting a follow-up request from the Bar, to which the accused did not respond until February 2009, after the issuance of a subpoena. We find that the Bar established, by clear and convincing evidence, that the accused knowingly failed to respond to the Bar's inquiries, in violation of RPC 8.1(a)(2).

---

[1] In his brief, the accused notes that, in late November or early December 2008, his brother suffered serious injuries at work, and the accused was required to take "several days" off to attend to family matters. There is no suggestion, however, that the family matters were the reason for his failure to respond to the Bar's repeated inquiries over the course of several months.

21

B.     *The Wilson Matter*

1.     *RPC 1.1 (competent representation)*

The Bar argues that the accused violated RPC 1.1 in representing Wilson in the Edwards litigation.  The Bar argues that the incompetence of his representation was demonstrated by, among other things, filing a notice of appeal before he filed his motions for JNOV and a new trial, thereby depriving the trial court of jurisdiction to hear his post-trial motions; then filing untimely motions for JNOV and new trial; and thereafter filing a second, untimely notice of appeal.  The accused argues that, although he admittedly made a few mistakes, his errors were not the result of incompetence but of understandable missteps in a complicated area of law.  According to the accused, his representation, "although possibly negligent, was not incompetent."

RPC 1.1 provides that, "[a] lawyer shall provide competent representation to a client.  Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation."  Whether a lawyer has provided competent representation "is a fact-specific inquiry." *In re Eadie*, 333 Or 42, 60, 36 P3d 468 (2001).  The standard for assessing competent representation is an objective one; the accused lawyer's mental state is not relevant. *In re Bettis*, 342 Or 232, 237, 149 P3d 1194 (2006).  This court's cases concerning incompetence of representation show that incompetence is found "where there is a lack of basic knowledge or preparation, or a combination of those factors." *Gastineau*, 317 Or at 553.  The focus is not on whether a lawyer may have neglected a particular task, but rather whether his or her representation in the "broader context of the representation" reflects the knowledge,

skill, thoroughness, and preparation that the rule requires. *In re Magar*, 335 Or 306, 320, 66 P3d 1014 (2003).

In this case, the accused's post-trial representation fails to reflect the knowledge, skill, thoroughness, and preparation reasonably necessary for his representation of his client. When the jury returned a verdict in favor of the Edwardses, the trial court told the accused that, if he would file a motion for JNOV on the claim for intentional interference with economic relations, it would enter a judgment notwithstanding the verdict. The court told the accused that it would also consider entering a judgment notwithstanding the verdict on the claim for intentional infliction of emotional distress. The court went so far as to caution the accused to be careful to read the rules concerning the timing of such motions, explicitly mentioning the need to file them within 10 days of entry of judgment. When the trial court later entered judgment, however, the accused did not file his motions for JNOV. Instead, he filed a notice of appeal, which had the effect of depriving the trial court of jurisdiction to hear any motions for JNOV. ORS 19.270(1) (2005), *amended by* Or Laws 2007, ch 66, § 1 (upon the filing of a notice of appeal, "[t]he Supreme Court or the Court of Appeals has jurisdiction of the cause," except as to determining attorney fees and costs or enforcing the judgment); *Welker v. TSPC*, 332 Or 306, 314, 27 P3d 1038 (2001) ("[A] notice of appeal deprives the trial court of jurisdiction to rule on a motion for new trial while the appeal is pending before the appellate court.").

Then, notwithstanding that he had just filed a notice of appeal that deprived the trial court of jurisdiction to hear such motions, the accused filed motions for JNOV

and for a new trial on both the intentional interference and intentional infliction claims. Moreover, he filed the motions 14 days after the entry of the judgment, not 10 days, as the trial court had explained the rules plainly require. *See* ORCP 63 D(1) ("A motion for judgment notwithstanding the verdict shall be filed not later than 10 days after entry of the judgment sought to be set aside[.]"); ORCP 64 F(1) (motion for new trial must be filed "not later than 10 days after the entry of the judgment sought to be set aside, or such further time as the court may allow").

The Court of Appeals sent the accused a notice of deficiency, because his notice of appeal had failed to comply with various provisions of the rules of appellate procedure. Meanwhile, the trial court held a hearing on the motions for JNOV and for a new trial and explained to the accused that the filing of the notice of appeal deprived the court of jurisdiction to act on them. The court informed the accused that he needed to dismiss the appeal, so that it could obtain jurisdiction to resolve the motions. The accused agreed. Nevertheless, the following week, instead of dismissing the appeal as he told the trial court he would, he filed an amended notice of appeal to cure the deficiencies that the Court of Appeals had identified, once again keeping jurisdiction from the trial court.

When the Court of Appeals dismissed the appeal because of the pending post-trial motions, it included in its order explicit instructions concerning the resolution of those motions. In particular, the court explained that a 55-day deadline for decision on them that had been tolled by the filing of the notice of appeal would recommence upon the entry of the appellate judgment terminating the appeal and that, upon the expiration of

24

that deadline, the motions would be deemed denied. That appellate judgment issued the same day.

When the 55-day deadline for decision passed, and the trial court was deemed to have denied the post-trial motions, the accused took no further action. By the deadline for filing a notice of appeal of the denial of those motions passed, the accused still took no action. Even after the Edwardses had sent a letter to the trial court notifying it that the case had become final because of the expiration of the deadline to appeal, the accused took no action. Not until two months after the deadline for appealing had passed did the accused attempt to file a late notice of appeal, asking -- without any citation to authority -- that the court simply allow the untimely filing.

The accused's representation does not reflect a few mistakes. Rather, it reflects a pattern of ignorance of the most basic of applicable rules and a failure to heed instructions of both the trial court and the Court of Appeals.

The accused insists that at least some of his actions were understandable mistakes. In particular, he contends that his untimely filing of the motions for JNOV and for a new trial 14 days after entry of judgment was a product of his misunderstanding of how the deadline was calculated. According to the accused, he thought that, under ORCP 10, he had additional time to file his motions because the trial court had mailed him a copy of the judgment that had been entered on the jury verdict.

ORCP 10, by its terms, does not apply. That rule allows an additional three

25

days when a prescribed period begins running upon "service" of a notice or similar document.[2] The deadline for filing a motion for JNOV does not run from service of any document. The plain text of the rule pertaining to post-trial motions specifically states that "[a] motion for judgment notwithstanding the verdict shall be filed not later than 10 days after the *entry of the judgment* sought to be set aside." ORCP 63 D(1) (emphasis added). *See also* ORCP 64 F(1) (a motion for new trial "shall be filed not later than 10 days after the entry of the judgment sought to be set aside, or such further time as the court may allow"). In that regard, it is worth recalling that the trial court specifically brought that fact to the attention of the accused, explaining that it is *entry* of the judgment, and not some other act, that triggers the 10-day filing deadline.[3]

But, even assuming for the sake of argument that the accused was merely negligent in failing to file the post-trial motions in a timely fashion, there remain the multiple other instances of failure to comply with rules, failure to follow court instructions, and failure to act by other deadlines, all of which are unexplained. We

---

[2] ORCP 10 C provides that,

"[e]xcept for service of summons, whenever a party has the right or is required to do some act or take some proceedings within prescribed period after the service of a notice or other paper upon such party and the notice or paper is served by mail, 3 days shall be added to the prescribed period."

[3] It could be argued that, because the accused untimely filed the motions for JNOV and a new trial, all of his subsequent actions -- incompetent or not -- are of no consequence, because there was nothing else that he could have done to cure the error. Even assuming for the sake of the argument the validity of the argument in the abstract, it fails in this case, as ORCP 64 F(1) allows the court to grant additional time for filing a motion for a new trial.

conclude that there is clear and convincing evidence that the accused violated RPC 1.1.

2.    *RPC 1.4(a ) (keeping client reasonably informed)*

The Bar argues that the accused violated RPC 1.4(a) by failing to keep Wilson informed of the status of the Edwards litigation, despite repeated requests from Wilson, as reflected in a lengthy series of e-mails between the accused and Wilson. The accused responds that the Bar has simply failed to meet its burden of proof. According to the accused, the e-mails on which the Bar relies demonstrate only that, on a few occasions, Wilson -- whom the trial panel found to be even less credible than the accused -- was impatient to hear from him about matters pertaining to the litigation. Moreover, argues the accused, he regularly contacted Wilson, his personal friend, by telephone and reported the status of the litigation.

RPC 1.4(a) provides that, "[a] lawyer shall keep a client reasonably informed about the status of a matter and promptly comply with reasonable requests for information." "[D]eciding whether a lawyer has violated RPC 1.4 requires a careful examination of all of the facts." *In re Groom*, 350 Or 113, 124, 249 P3d 976 (2011). In this case, a close examination of the relevant e-mails leads us to conclude that there is insufficient evidence that the accused violated RPC 1.4(a).

There is indeed a lengthy series of e-mails between the accused and Wilson from March 2007 through the end of the year. But there is little that demonstrates a failure of the accused to keep Wilson informed. They reflect that the accused and Wilson spoke with one another by telephone about the case, although the details of what was reported cannot easily be gleaned. And they show that, in some instances, Wilson asked

27

about the status of the case, but the extent to which the accused responded simply cannot be determined from the record.

In late May 2007, after the Court of Appeals returned the matter to the trial court, Wilson sent the accused an e-mail asking whether the matter had been set for hearing. Two days later, he sent another, similar, e-mail. And several days after that, he sent another. But there is no more mention of the matter for more than a month.

In late July, the accused sent an e-mail to Wilson reporting that the Court of Appeals had not yet returned the case file to the trial court. Two weeks later, the accused and Wilson exchanged several e-mails about Wilson's outstanding balance; Wilson asked about the status of the case. Three days after that, Wilson asked whether there had been a stay of proceedings. A month later, in mid-September 2007, Wilson demanded that the accused schedule a hearing on the pending post-trial motions. The following day, the accused reported to Wilson that the motions already had been denied.

The e-mail trail is sketchy. At best -- taking the e-mails at face value and assuming for the sake of argument Wilson's credibility -- they suggest that, during the period from early August to mid-September, the accused failed to report that the post-trial motions had been denied and the time to appeal had run. But that assumes that the accused was aware of the fact that the motions had been denied because of the expiration of the 55-day period. The problem with that is that other e-mails, such as the July 20 e-mail reporting that the Court of Appeals had yet to return the case file to the trial court, suggest that the accused believed, albeit erroneously, that the 55-day clock had not yet recommenced running. Moreover, the accused testified that he regularly reported to

28

Wilson about the status of the case by telephone between the end of trial and September 2007, a fact that Wilson conceded. In that regard, we note that the trial panel found that neither party was particularly credible on the matter of client communication, an observation with which we concur. Under the circumstances, we conclude that there is simply not enough in the record to establish, by clear and convincing evidence, that the accused violated RPC 1.4(a).

3. *RPC 3.1 (taking frivolous positions)*

The Bar argues that the accused violated RPC 3.1 by asserting frivolous arguments when he, among other things, filed an untimely second appeal, along with a motion to set aside default and for a retroactive extension of time to file the appeal. The accused responds that, although his arguments concerning the late filing of the second appeal might not have been well taken, they were not frivolous. According to the accused, he simply argued for an extension of existing law to "salvage Mr. Wilson's appeal, not for frivolous purposes." Although the accused made no mention of the legal basis for his argument for the extension of existing law at the time he filed his second appeal, he now asserts that he intended to argue that the court should "extend" ORS 138.071(5), which authorizes late-filed appeals in criminal cases in limited circumstances, to civil cases as well.

RPC 3.1 provides, in part:

"In representing a client or the lawyer's own interests, a lawyer shall not knowingly bring or defend a proceeding, assert a position therein, delay a trial or take other action on behalf of a client, unless there is a basis in law and fact for doing so that is not frivolous, which includes a good faith argument for an extension, modification or reversal of existing law[.]"

The rule prohibits a lawyer from "knowingly" asserting a position during litigation that is "frivolous." The rule does not define "frivolous." But this court has held that a lawyer takes a "frivolous" position when there is no basis in law or fact for that legal position. *In re Smith*, 348 Or 535, 544, 236 P3d 137 (2010) ("[T]he pivotal legal issue is whether there was a nonfrivolous basis in law or fact for the accused's actions.").

Turning to the circumstances of this case, we conclude that there was no basis in law or fact for the accused's argument that the Court of Appeals could authorize him to file a notice of appeal beyond the statutory deadline. It is well settled that appellate jurisdiction is purely statutory. As this court explained in *City of Portland v. Duntley*, 185 Or 365, 371, 203 P2d 640 (1949), "[e]xcept for that limited class of cases in which the Supreme Court exercises original jurisdiction, this is an appellate court deriving its jurisdiction from the statutes. They are the sole source of appellate jurisdiction."

ORS 19.255(1) provides that the time for filing and serving a notice of appeal is "within 30 days after the judgment appealed from is entered in the register." If, after entry of the judgment, a motion for new trial or a motion for judgment notwithstanding the verdict has been filed, then the deadline is "[w]ithin 30 days after the order disposing of the motion is entered in the register, or within 30 days after the motion is deemed denied" because of passage of more than 55 days. ORS 19.255(2).

Nothing in ORS 19.255 suggests that courts possess the authority to waive the timely filing requirements because of counsel's neglect or any other reason. To the contrary, ORS 19.270(2) provides that the filing of the notice of appeal within the time

30

limits prescribed by ORS 19.255 is "jurisdictional and *may not be waived*." (Emphasis added.) *See Gadda v. Gadda*, 341 Or 1, 10, 136 P3d 1099 (2006) (the timely filing and service requirements of ORS 19.255 are jurisdictional).

ORS 138.071 governs appeals in criminal cases. It begins by stating that, "[e]xcept as provided in this section, a notice of appeal must be served and filed not later than 30 days after the judgment or order appealed from was entered in the register." ORS 138.071(1). In the next three subsections, the statute spells out additional deadlines in cases in which motions for new trial have been filed, a cross-appeal has been filed, or a supplemental or corrected judgment has been filed. ORS 138.071(2) - (4). An express exception is then set out in ORS 138.071(5)(a), which provides that, upon a criminal defendant's motion, the Court of Appeals is authorized to grant "the defendant leave to file a notice of appeal after the time limits described in subsections (1) to (4) of this section," provided that the defendant shows that the failure to file by the deadline was not attributable to him or her personally and that the defendant has a colorable claim of error.

The accused does not explain -- and we do not understand -- how ORS 138.071(5) can be read to apply to civil appeals. By its terms, the statute applies only to criminal appeals, and its exception applies only to the time limits that are set out in ORS 138.071(1) to (4). Nothing in text mentions anything about ORS 19.255 or the deadlines for filing notices of appeals in civil or other cases. The accused cites no other statute that would authorize the Court of Appeals to permit a late-filed notice of appeal in civil cases, and we are aware of none. Given that, as we have noted, appellate jurisdiction is purely statutory, there appears to be no basis in law or fact for the accused's assertion that the

31

court had authority to permit him to file an untimely notice of appeal. We therefore conclude that the Bar met its burden of proof that the accused violated RPC 3.1.

4. *RPC 8.4(a)(3) (misrepresentation)*

The Bar finally argues that the accused violated RPC 8.4(a)(3). According to the Bar, the accused misrepresented the state of the Edwards case to his client Wilson by knowingly failing to report to Wilson that he had failed to obtain a stay of proceedings and that the motions for JNOV and for a new trial had been denied. As we have noted, the trial panel found that the Bar had failed to meet its burden of proof with respect to that charge. We agree.

RPC 8.4(a) states, in part,

"It is professional misconduct for a lawyer to:

"* * * * *

"(3) engage in conduct involving dishonesty, fraud, deceit or misrepresentation that reflects adversely on the lawyer's fitness to practice law[.]"

In this case, the Bar's argument that the accused violated that rule is predicated on its assertion that the accused failed to report to his client Wilson in the first place. We have concluded, however, that the Bar failed to establish that the accused, in fact, failed to report to Wilson. Because the Bar did not establish the factual predicate for its assertion that the accused violated RPC 8.4(a)(3), we conclude that the trial panel did not err in concluding that the accused did not violate RPC 8.4(a)(3).

III. SANCTION

Having concluded that the accused violated the foregoing rules of

32

professional conduct, we must determine the appropriate sanction. To determine the appropriate sanction, this court engages in a two-step analysis. First, we determine an "initial presumptive sanction," based on our analysis of (1) the ethical duty or duties that the accused violated, (2) the accused's mental state, and (3) the actual or potential injury that the accused caused. *Hostetter*, 348 Or at 598. Second, we then adjust that sanction based on aggravating or mitigating circumstances that may apply and consider whether that adjusted sanction is consistent with our case law. *Id.* In determining the appropriate sanction, we take into account the American Bar Association's *Standards for Imposing Lawyer Sanctions* (2005). The purpose of the sanction is not to penalize; rather, it is to "protect the public and the administration of justice from lawyers who have not discharged, will not discharge, or are unlikely to properly discharge their professional duties to clients, the public, the legal system, and the legal profession." *Hostetter*, 348 Or at 598 (quoting ABA Standard 1.1).

A.    *Preliminary Analysis*

We begin with the ethical duties violated. The accused committed seven violations of the rules of professional conduct. Those violations breached the accused's duties to his clients, the legal system, and the legal profession. ABA Standard 4.1 (failure to properly handle client funds violates duty owed to client); ABA Standard 4.5 (failure to provide competent representation violates duty owed to client); ABA Standard 6.2 (bringing a frivolous action violates duty owed to legal system); ABA Standard 7.0 (charging a clearly excessive fee violates duty owed to legal profession).

As for the mental state for those violations, the accused asserts that he acted

33

"negligently," while the bar contends that the accused committed the violations "knowingly." A lawyer acts with "negligence" if the lawyer "fails to be aware of a substantial risk that circumstances exist or that a result will follow, which failure is a deviation from the standard of care that a reasonable lawyer would exercise in the situation." ABA Standards at 10. A lawyer acts with "knowledge, when the lawyer acts with conscious awareness of the nature or attendant circumstances of his or her conduct both without the conscious objective or purpose to accomplish a particular result." *Id.*

In the Favre matter, we find that the accused violated RPC 1.5(a), RPC 1.15-1(a), (c), and (d), and RPC 8.1(a)(2) knowingly. As to the fee that the accused charged Favre, the accused was aware of the amount of that fee and the lack of work that he performed on the extradition matter. As to the failure to respond to the bar inquiries regarding the Favre matter, the accused knew of his obligation to respond and failed to do so in a timely manner.

In the Wilson matter, we find that the accused violated RPC 1.1 negligently but that he violated RPC 3.1 knowingly. We agree with the trial panel that the accused "demonstrated a woeful lack of competence in his post-trial actions." Still, we do not think the evidence supports a finding that he did so knowingly. Instead, it appears that the accused failed to properly research the applicable post-trial and appellate issues and, thus, was unaware of the "substantial risk that circumstances exist or that a result will follow." The same cannot be said of the accused's violation of RPC 3.1. As discussed more thoroughly above, the accused knowingly filed a frivolous appeal.

In both matters, the accused's misconduct caused actual injury. *Hostetter*,

34

348 Or at 600 (defining "actual injury" as the "actual harm to a client, the public, the legal system, or the profession"). As to the Favre matter, the accused caused actual, financial harm to his client, Favre, because the accused collected an excessive fee of $1,200. Besides the direct, financial harm, the accused clearly caused Favre anxiety and aggravation. *In re Snyder*, 348 Or 307, 321, 232 P3d 952 (2010) ("Client anguish, uncertainty, anxiety, and aggravation are actual injury under the disciplinary rules."). Additionally, by failing to comply with the trust account rules, RPC 1.15-1(a), (c), and (d), in that matter, the accused "caused actual harm to the legal profession." *Peterson*, 348 Or at 343. Last, the accused caused actual injury to the legal system when the accused failed to respond to the bar's lawful requests for information on the Favre matter. *In re Koch*, 345 Or 444, 456, 198 P3d 910 (2008).

Turning to the Wilson matter, the accused's violation of RPC 1.1 caused actual harm to Wilson. Specifically, because the accused failed to move for judgment notwithstanding verdict, Wilson was subject to a $30,000 judgment that he most likely would not have been had the accused filed the motion. The accused's violation of RPC 3.1 in the Wilson matter also caused actual injury to the legal system by wasting judicial resources in the handling of the frivolous notice of appeal filed by the accused.

Considering the duties violated and the injuries caused in the Favre matter, the presumptive sanction is suspension. ABA Standard 4.12 ("Suspension is generally appropriate when a lawyer knows or should know that he is dealing improperly with client property and causes injury or potential injury to a client."); ABA Standard 7.2 ("Suspension is generally appropriate when a lawyer knowingly engages in conduct that

35

is a violation of a duty as a professional and causes injury or potential injury to a client, the public, or the legal system."). As to the Wilson matter, the presumptive sanction for the accused's violation of RPC 1.1 is a public reprimand. ABA Standard 4.53(a). The presumptive sanction for the accused's violation of RPC 3.1 is suspension. ABA Standard 6.22. In summary, we conclude that the presumptive sanction in this case is suspension.

B.      *Aggravating and Mitigating Circumstances*

We next consider the aggravating and mitigating circumstances. There are four aggravating factors. First, the accused has a history of prior disciplinary offenses. ABA Standard 9.22(a). *See In re Obert*, 336 Or 640, 642, 89 P3d 1173 (2004) (accused was suspended for 30 days for violating *former* DR 6-101(B) (2004) (neglect), *former* DR 5-105(E) (2004) (representing multiple current clients whose interests conflict), *former* DR 1-102(A)(3) (2004) (misrepresentation), and *former* DR 9-101(C)(4) (2004) (failure to return client property promptly)).

Second, the accused's current violations exhibit a pattern of misconduct in both matters. ABA Standard 9.22(c). In the Wilson matter, the accused first violated his duty of competence, RPC 1.1. In an attempt to fix his mistake, he filed a frivolous notice of appeal, RPC 3.1. In the Favre matter, he collected an improper fee, RPC 1.5(a), wrongfully deposited it in his business account, RPC 1.15-1(a) and (c), and did not promptly refund the monies to the client, RPC 1.15-1(d). Third, the accused committed multiple offenses. ABA Standard 9.22(d). Fourth, the accused has been practicing law in the State of Oregon since 1996 and, thus, has substantial experience in the practice of

36

law. ABA Standard 9.22(i).[4]

There are two relevant mitigating factors. First, in the Wilson matter, the accused fully and freely disclosed all relevant information to the disciplinary board and fully cooperated with that investigation. ABA Standard 9.32(e). Granted, the same cannot be said of the Favre matter. Second, the accused presented evidence of his good reputation in the community. ABA Standard 9.32(g).

The accused argues that, with respect to the Favre matter, this court should also consider his good-faith effort to make restitution or rectify consequences of misconduct, ABA Standard 9.32(d), because Favre received a refund of the $1,200 fee. That mitigating factor, however, is inapplicable. Per ABA Standard 9.4(a), the "forced" restitution by Favre's credit card company does not weigh in the accused's favor.

In summary, the aggravating factors outweigh the mitigating factors. Considering that fact in conjunction with the presumptive sanction for the accused's seven violations, suspension is necessary. To determine the appropriate length of suspension, we turn to this court's case law.

C.     *Case Law*

Although "case-matching in the context of disciplinary proceedings 'is an

---

[4]     The trial panel also found that the accused acted with a selfish motive. ABA Standard 9.22(b). Considering the record as a whole, we conclude that there is insufficient evidence of that aggravating factor. We do not, however, agree with the accused that his lack of a selfish motive is a mitigating factor. In sum, we do not think the accused's motive favors one conclusion or the other.

37

inexact science,'" particularly when the case involves "multiple violations in multiple matters," the court's case law can "provide some guidance" as to the appropriate length of suspension. *Hostetter*, 348 Or at 602 (quoting *In re Stauffer*, 327 Or 44, 70, 956 P2d 967 (1998)). Reviewing this court's previous cases, it is appears that several of the accused's violations, standing alone, would generally result in suspension for 30 to 90 days.

For example, violation of RPC 1.15-1 (trust account rules) usually results in suspension for 30 to 60 days. *See Peterson*, 348 Or at 345 (suspended for 60 days for violation of RPC 1.15-1(a) and (c)); *Snyder*, 348 Or at 324 (suspended for 30 days for violation of RPC 1.4 and RPC 1.15-1(d)); *In re Eakin*, 334 Or 238, 257-59, 48 P3d 147 (2002) (suspended for 60 days for violations of *former* DR 9-101(A), (C)(3), and (C)(4), which are the substantially similar predecessors of RPC 1.15-1).

Violation of RPC 8.1(a)(2) (failure to respond) can result in a public reprimand or, in more flagrant cases, suspension for 60 days. *In re Haws*, 310 Or 741, 753-54, 801 P2d 818 (1990) (noting that, generally, a "reprimand would suffice," but that 63 days' suspension was appropriate for "repeated" uncooperative behavior in violation of *former* DR 1-103(C), the predecessor to RPC 8.1(a)(2)).

Violation of *former* DR 6-101(A) (2004) (failure to provide competent representation), which is the predecessor to RPC 1.1, can result in suspension for 30 days or as much as 90 days when violation of that rule is combined with other violations and aggravating factors. *Bettis*, 342 Or at 242 (suspension for 30 days for failing to provide competent representation); *In re Gresham*, 318 Or 162, 164-69, 864 P2d 360 (1993) (suspension for 91 days for failure to provide competent representation, neglecting a legal

38

matter, and conduct prejudicial to the administration of justice; several aggravating factors present).

Similarly, violation of *former* DR 2-106(A) (2004) (excessive fee), the predecessor to RPC 1.5, can result in a public reprimand for a single, isolated violation, *In re Paulson*, 335 Or 436, 438, 71 P3d 60 (2003), suspension for 30 days when there is an excessive fee rule violation and other trust account rule violations, *In re Fadeley*, 342 Or 403, 414, 153 P3d 682 (2007), or as much as 90 days' suspension for collecting an excessive fee combined with other rule violations and aggravating factors, *Balocca*, 342 Or at 298.

Last, in a recent case, this court concluded that the appropriate sanction for violation of RPC 3.1 (frivolous action), along with other rule violations involving dishonest conduct, was suspension for 90 days. *Smith*, 348 Or at 558. Considering the accused's violations as a whole in light of the usual sanction for an individual violation of each of the rules violated in this case, suspension from five to 11 months is appropriate.

In this case, we agree with the trial panel that six months' suspension is the appropriate sanction. The accused caused actual injury to his clients, the Bar, the legal system, and the legal profession. There are several significant aggravating factors present: the accused was subject to discipline on a prior occasion and, in this case, committed multiple violations. Based on those facts and our previous cases outlined above, we conclude that six months will impress upon the accused the gravity of his violations and the significant impact his actions had on his clients.

39

The accused is suspended from the practice of law for a period of six months, commencing 60 days from the date of this decision.